EDWARD G. PENDLETON

*v.*

CHARLES F. GONDOLF et al.

[Submitted June 15th, 1915. Determined November 11th, 1915.]

1. Where one engaged in the business of swindling others for a liveli-hood conveyed realty to his wife without consideration, such conveyance was made in fraud of future creditors, that being the constant purpose of the grantor.

2. Where a husband, who was engaged in the business of swindling others for his livelihood, conveyed realty for value to his wife, who had no knowledge of the nature of his pursuits, such wife, as against the husband's creditor suing to set aside the conveyance, was entitled to a lien upon the property to the extent of the value paid by her.

3. In view of the statute giving the defendant in attachment one year after distribution of the proceeds of sale under the attachment judgment to sue the attachment creditor for money received by him which was not due and owing, where judgment in attachment proceedings was entered after the attachment creditor's bill in equity in aid of the attachment to set aside an alleged fraudulent conveyance by the attachment debtor was filed, and before final hearing the judgment in the attachment pro-ceedings was not conclusive as to the debt due from the attachment debtor to the complainant, and was not operative to relieve him from establishing, in his suit to set aside the conveyance, the nature and amount of his claim, nor to deny to the grantee the right to contest the existence of a debt from her grantor to the complainant for which an attachment could be sustained, since the judgment in the attachment suit was *in rem* and purely statutory, and, while conclusive for certain pur-poses, was not conclusive of the debt, the provision of the statute also being inconsistent with the conclusiveness of the judgment as to the debt.

4. Where complainant was swindled through his agreeing to furnish the money for a "wire-tapping" scheme to defraud others and to be operated by defendant and a supposed employe of the Western Union Telegraph Company, who agreed to betray his trust, such complainant could not maintain a suit in equity in aid of his attachment levy against the defendant to set aside such defendant's conveyance of realty to his wife as fraudulent against future creditors, since he who comes into equity must come with clean hands.

5. In such case the existence of *2 Comp. Stat. p. 2624 § 5*, au-thorizing a recovery within six months of money paid over in gambling transactions, did not support complainant's right to sue, where the transaction whereby he lost the money which he sought to recoup from

defendant's property was not a gambling transaction, the pretended pool room where the money was lost having not been such in fact and no real bets having been made, but merely a fictitious plant operated to fleece complainant.

On final hearing on creditor's bill.

. *Mr. Martin V. Bergen,* for the complainant.

*Messrs. Wilson & Carr,* for the defendant Mary E. Gondolf.

LEAMING, V. C.

Complainant has caused a writ of attachment to be issued in his behalf against the property of defendant Charles F. Gondolf, as a non-resident debtor, and the writ has been levied on certain real estate in Atlantic City, the legal title to which now stands in the name of Maud Gondolf. Maud Gondolf is the name by which the wife of the attachment debtor is commonly known; her real name is Mary E. Gondolf.

The bill in this suit is in aid of the attachment levy, and seeks a decree declaring the conveyance to the wife of the attachment debtor fraudulent and void as against the lien of complainant's writ.

The conveyance to the wife of the attachment debtor was made April 18th, 1911. The debt for which the attachment was issued was contracted in January, 1912. Complainant's right to relief against the conveyance is accordingly based upon the claim that the conveyance was made to defraud future creditors.

The writ of attachment was issued and levied December 9th, 1912. The bill in this suit was filed December 16th, 1912. Pending this suit, and before final hearing, judgment was entered in plaintiff's favor on the report of the auditor in the attachment proceedings; that judgment has been offered and received in evidence in this suit.

The primary question for consideration herein is whether the conveyance to the wife of the attachment debtor was made with intent to defraud his future creditors.

The evidence clearly establishes that in January, 1912, when the debt which is made the foundation of this suit was contracted, Charles F. Gondolf, the attachment debtor, was a member of a gang of professional swindlers in New York City, commonly called "wire-tappers," and was at that time operating in that city as a confidence man in connection with that gang. It was through these swindling operations conducted by the attachment debtor and his confederates that complainant lost the money for which the attachment was issued. It is urged that the proofs do not establish with certainty what the attachment debtor was doing in the preceding April when the property here in question was conveyed to his wife; but I am convinced that there can be no doubt that he was then engaged in the same or kindred criminal pursuits as a means of livelihood. It is established that prior to that time (in 1908) he was conducting a gambling-house in Atlantic City and that prior to, at the time of, and subsequent to the date of the conveyance in question, he was living in New York City under assumed names to conceal his identity. Without taking into account the testimony of an official of the New York police department of transactions of the attachment debtor touching which the official had no direct personal knowledge and disregarding his testimony of the fact that the attachment debtor had been known to his department for many years as a professional crook and confidence man, it is yet reasonably certain that at the time of the conveyance here in question the attachment debtor was in fact engaged in these unlawful pursuits as a means of livelihood. The business or avocation in life of swindling others necessarily carries with it the ever-present purpose of defrauding future creditors; such a business may be said to be the business of defrauding future creditors, for its successful operation is dependent upon escaping from liabilities incurred in its pursuit. When a person so engaged makes a voluntary conveyance to his wife of all of his property, it is impossible to resist the conclusion that the conveyance was made to defraud future creditors. Should it be doubted that when the conveyance here in question was made the attachment debtor was operating as a confidence man, it is yet entirely clear that he was so operating soon thereafter; the con-

veyance was either made while he was pursuing the swindling operations already referred to or a short time before he entered upon those pursuits. Such a conveyance can only be properly regarded as made in fraud of future creditors.

It is urged in behalf of Mrs. Gondolf that the conveyance to her by her husband was not wholly voluntary. The evidence discloses that prior to the date of the conveyance to Mrs. Gondolf the attachment debtor had conveyed the premises in question to one Dora Collins; the conveyance to Mrs. Gondolf was from Mrs. Collins. Mrs. Gondolf has testified that the conveyance from her husband to Mrs. Collins was to secure a loan of $1,000 made by Mrs. Collins to her husband, and that her husband agreed with her that if she would pay off that loan she could have the property, and that she subsequently discharged the Collins loan with her own money, and Mrs. Collins then conveyed the property to her at the request of her husband. I am unable to regard as false this testimony, corroborated as it is in material particulars.

The property conveyed was worth about $14,000. As to the excess over $1,000 the conveyance was admittedly voluntary. Nor am I able to treat as false the claim of Mrs. Gondolf that she was not aware of the nature of her husband's pursuits, and had no reason to believe that the conveyance to her was intended by her husband to defraud creditors. Any decree in behalf of complainant must accordingly recognize a lien in behalf of Mrs. Gondolf to the amount of $1,000.

After the bill in this suit was filed, and before final hearing, a judgment in the attachment proceedings was entered for the amount claimed pursuant to the report of the auditor. It is now urged in behalf of complainant that that judgment is conclusive as to the debt due from the attachment debtor to complainant herein, and is operative to relieve the complainant herein from the necessity of establishing in this suit the nature and amount of his claim, and is also operative to deny to Mrs. Gondolf the right to contest the existence of a debt from her grantor to complainant for which an attachment could be sustained. I am unable to adopt that view. As the attachment judgment had not been entered at the time the bill was filed, the

bill merely avers the indebtedness and the issuance and levy of the writ; the answer of Mrs. Gondolf denied the indebtedness. No supplemental pleadings have been filed, but no objection has been made based on that circumstance. No answer has been filed by the attachment debtor and no appearance has been entered by him in the attachment proceedings. In these circumstances, what conclusive force must be given to the judgment in attachment?

The conclusive force to be given to a judgment which is made the basis of a suit of this nature is considered in *McCanless* v. *Smith, 51 N. J. Eq. 505*, and again in *Minzesheimer* v. *Doolittle, 56 N. J. Eq. 206*. But in these two cited cases the judgments were *in personam*. In the present case, the judgment is *in rem* and is purely statutory, and while it may be regarded as conclusive for certain purposes, it is not conclusive of the debt. By the terms of our statute the defendant in attachment is given one year after distribution of the proceeds of sale under the attachment judgment to sue the attachment creditor for money received by him which was not due and owing. This provision of our statute is pointed out in *Miller* v. *Dungan, 36 N. J. Law 21*, as wholly inconsistent with the idea of conclusiveness of the attachment judgment as to the debt, and in *Schenck* v. *Griffin, 38 N. J. Law 462*, our court of errors and appeals adopts the same view.

At final hearing herein complainant was required to establish the debt for which his attachment was issued. The evidence disclosed that the attachment was issued for money which complainant had lost through swindling operations of the defendant in attachment and his associates. The circumstances disclosed were briefly as follows: Complainant, while in New York City, was approached by a man who said his name was Hall and that he had met complainant before; in that manner he gained complainant's confidence. Hall subsequently introduced to complainant the defendant in attachment under the name of McDonald. Hall and McDonald then induced complainant to believe that McDonald, by breach of trust with the Western Union Telegraph Company, with which company they falsely represented that McDonald was connected, could procure advance in-

formation touching the result of horse races then in progress, and with that information sure-thing wagers could be made in a certain pool room to which Hall and McDonald would conduct complainant. Complainant was to supply the necessary money and the earnings were to be divided among the three. Complainant assented to the arrangement and made the bets at the place designated and in the manner directed by the advance information supplied to him as arranged. The place where the bets were made proved to be a fake pool room, and the information supplied touching the races was also manufactured for the occasion; the result was the loss by complainant of the money for which the attachment was issued.

It thus appears that the contract between complainant and defendant in attachment, through which complainant lost the money for which the writ of attachment was issued, was a contract whereby the defendant in attachment was to supply to complainant information to be procured through a breach of trust to his employer, which information so supplied was to be used by complainant to swindle what complainant believed to be a pool room; the proceeds of the proposed swindle were to be shared by the three participants in the unlawful undertaking. There was in fact no real pool room and no breach of trust by a trusted employe; complainant in consequence failed to accomplish his unlawful purpose. But complainant's moral turpitude in the transaction was in no way lessened by the miscarriage of his plans; the moral turpitude of one who attempts the assassination of another is in no way involved in the circumstance that his intended victim escapes through his inaccurate aim. It follows that this court is now called upon to award a purely equitable remedy to one who has been guilty of unconscionable conduct clearly involving his moral turpitude in the very transaction which forms the basis of his claim.

It is a maxim of equity that he who comes into a court of equity must come with clean hands, and in the ordinary application of that maxim a court of equity denies its remedies to a complainant who has been guilty of bad faith, fraud or unconscionable acts in the transaction which forms the basis of his suit. The inquiry, therefore, arises whether in the circumstances of

this suit the proper application of that maxim is operative to deny to complainant herein the relief now sought by him.

In the law courts a similar principle is recognized, but in its application cases are to be found in which the courts incline to measure the comparative guilt of the respective parties and extend relief to one who is comparatively innocent; that situation usually has been presented in cases in which the wrongful conduct of the party seeking relief has arisen through undue influence arising from a trust relationship of the parties, through mental weakness, threats, fear or oppression and like circumstances which have been regarded as sufficient to measurably excuse the wrongful conduct involved. And even when the parties have been found to be *in pari delicto,* relief has at times been awarded on the ground that in the particular case public policy has been found to be best conserved by that course. Cases are also to be found in which courts of equity have adopted similar views. But I am unable to find any justification for a court of equity to extend equitable relief to a suitor who has been guilty of conduct involving the degree of moral turpitude of that which is involved in the conduct of complainant herein in the very transaction which forms the basis of the relief sought when that conduct and the turpitude involved in it have been impelled by the deliberate and intelligent purpose of the rational and normal intellect of a free agent. While complainant herein was the victim of his associates, and while his conduct was measurably influenced by them, yet his determination to enter with them into what he clearly understood to be swindling operations was wholly voluntary on his part; there was presented to him what appeared to him to be an opportunity of pecuniary profit by engaging in wrong-doing and he deliberately accepted the opportunity; the influence which impelled him was his cupidity and not the influence of his associates; his moral turpitude included not only the purpose to swindle others, but also a purpose to accept the benefits of a breach of trust of his associates as a part of the proposed plan of operations. Any attempt to measure the degrees of moral turpitude involved in the conduct of the respective parties is futile; complainant's associates sought to swindle complainant, complainant sought to swindle

others; if the degree of turpitude can be measured by the money involved, the amount complainant intended to gain by his wrongful conduct was many times more than the amount which his associates sought to gain from him by their wrongful operations. The suggestion that complainant was corrupted by his associates discloses only too clearly his willingness to engage in crime for monetary gain; there was no coercion and no undue influence in the sense in which that term is properly used; the opportunity for gain from wrong-doing was presented and accepted; complainant's conduct can only be regarded as having been voluntary and intelligent in its purpose.

As already suggested, cases are to be found in which it has been thought that public policy is best conserved by awarding relief in cases somewhat of this nature; but I am convinced that the decisions of the courts of this state, and the decided weight of authority elsewhere, is to the contrary. In *Cutler* v. *Tuttle, 19 N. J. Eq. 549,* it was held by our court of errors and appeals that where one supplied money for the purchase of a property and caused the title to be taken in the name of another to defraud creditors of the purchaser, a court of equity would not decree a resulting trust in behalf of the person who supplied the money. In *Johns* v. *Norris, 22 N. J. Eq. 102,* it was held by this court that a widow who had procured a person to purchase at foreclosure sale the real estate of her late husband at prices below its real value by a contrivance agreed upon to deter bidders by giving out that the purchase was for the benefit of the widow and her family, was a party to a fraud against the heir and creditors, and that in consequence she could not come into equity for relief against her confederate because of her unclean hands. In *Watson* v. *Murray, 23 N. J. Eq. 257,* a bill was filed by a member of a partnership against the other partners for discovery and an accounting of the profits and assets of the firm, which firm was engaged in a lottery business. A demurrer to the bill was sustained by this court. The ground of the decision is disclosed in a single quotation from the opinion: "It (the business) is eminently one to which the maxim applies, *ex turpi causa non oritur actio.* 'The objection,' says Lord Mansfield, 'that a contract is immoral or illegal, as between plaintiff and defendant,

sounds at all times very ill in the mouth of defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded on general principles of policy. No court will lend aid to a man who founds his cause of action upon an immoral or illegal act.' *Holman* v. *Johnson, Cowp. 343.*" It was also there held to be immaterial that the bill was for an accounting among the partners and not in furtherance of the illegal contract or business. In *Ellicott* v. *Chamberlin, 38 N. J. Eq. 604,* an executor had agreed to renounce his executorship for $10,000. When he renounced he was paid part of the agreed amount in cash and part by the delivery of certain securities and a note was given for the balance. An action at law was subsequently brought on the note, and a bill was then filed in this court by the maker of the note to restrain the action at law and also to compel the restoration of the securities which had been delivered and also to compel the repayment of the money which had been paid. It was held by our court of errors and appeals that the contract to receive compensation for renunciation of an executorship was illegal as against public policy and that this court should leave the parties where it found them. The prayer for the return of the securities and money was accordingly denied. The prayer for an injunction against the suit at law was denied because the defence to the note was as available in a court of law as here. In *Winans* v. *Graves, 43 N. J. Eq. 263,* it was held by our court of errors and appeals that a party to whom a judgment had been assigned in pursuance of an understanding with the judgment debtor that the assignee should hold the same for the purpose of protecting the judgment debtor's property from claims of his creditors, could receive no aid from a court of equity in reaching and applying to the payment of the assigned judgment property which the judgment debtor had placed in the name of a third party in fraud of his creditors. In *Brooks* v. *Cooper, 50 N. J. Eq. 761,* it was held by the same court that relief would not be afforded a suitor if based upon a transaction contrary to the terms or spirit of a statute or contrary to the policy of the laws of the state. In *Hildebrand* v. *Willig, 64 N. J. Eq. 249,* it was held by this court that this court would not aid the heir of one who had conveyed his land with intent to

defraud his creditors even though it appeared that no creditors had been in fact defrauded. In *Camden Iron Works* v. *Camden, 64 N. J. Eq. 723,* it was held by our court of errors and appeals that if a claim filed under our Municipal Liens act should contain demands known by the claimant to be beyond the actual amount due or should knowingly omit any credit to which the contractor was entitled no lien could be enforced. The court said: "It needs to be remembered that these proceedings for the enforcement of liens under this statute are made cognizable in equity, and that the principles of equity are applicable to one who comes into court to foreclose a lien of this character. He who seeks equity must do equity, and he who comes into equity must come with clean hands." In *Vulcan Detinning Co.* v. *American Can Co., 70 N. J. Eq. 588,* this court denied relief to complainant because of the unclean hands of the parties from whom complainant acquired its rights to the secret process which it sought this court to protect. The opinion filed says: "It is not alone fraud or illegality which will prevent a suitor from entering a court of equity. Any really unconscientious conduct connected with the controversy to which he is a party will repel him from the forum whose very foundation is good conscience. *Pom. Eq. Jur.* § *404.*" This case was reversed in our court of errors and appeals (*72 N. J. Eq. 387*), for the reason that the latter court determined that complainant had no actual knowledge of unconscionable conduct of its vendor, hence, while complainant's legal rights might be affected by the knowledge of its agent, complainant's conscience could not be so affected and complainant could not, in consequence, be properly charged with unclean hands within the meaning of the equitable maxim. But no other criticism was made of the application of the equitable maxim by the lower court. These decisions are all necessarily based upon the assumption that a denial of equitable relief to a participant in wrong-doing forms a part of the recognized public policy of this state as best conserving public interests; it follows that to aid a participant in wrong-doing in the recovery of the property which he has disposed of in the attempted execution of his wrongful purposes on any theory that such course might best conserve public interests becomes im-

possible without a complete reversal of our defined policy as disclosed in the cases above cited.

I also think it immaterial in this case whether the maxim, *"In pari delicto potior est conditio defendentis,"* is to be understood as but a corollary to the general rule *"Ex dolo malo non oritur actio,"* or as a limitation of the latter maxim, for parties are necessarily to be regarded as *in pari delicto* when the executed transaction which is made the basis of equitable relief is one in which each party of his own free and intelligent will entered with a deliberate and defined purpose to swindle others. "In the *Boatright Cases,*" reported in *195 Mo. 693; 130 Fed. Rep. 905,* and *147 Fed. Rep. 325,* there is found an element of coercion which finds no parallel in the present case.

It is contended in behalf of complainant that the transaction which is made the basis of this suit was a gaming transaction falling within the provisions of a New York statute which gives a right of civil action for money lost, and that the laws of that state permit the action to be brought within the period within which the attachment was issued. In behalf of defendant it is contended that the statute of this state limits the period within which such actions can be brought to six calendar months. *2 Comp. Stat. p. 2624 § 5.* The attachment here in question was not issued within that period.

A court of equity will ordinarily refuse relief under a gaming contract which has been executed by the payment of money, but where a statute authorizes affirmative relief in a gaming, usurious or other kindred transaction, this court necessarily extends its remedies in furtherance of such relief. I think it unnecessary, however, to consider here either the provisions of the New York statute or the effect of our statute limiting the period within which such actions shall be brought in this state. The transaction here involved was not a gaming transaction. The place where the money was lost was not in fact a pool room and no real bets were made. The pretended wagers were mere form and wholly without substance. They were not in fact wagers. Complainant did not undertake to make a wager; believing that he knew the result of the race it was his purpose and aim to rob the supposed pool room by means of a pretended wager; there was

in his conception of the situation, and, in fact, no contingency to afford the basis of a real wager. Complainant's adversaries did not undertake to make a wager; they, too, were engaged in a plan to rob by means of pretended wagers. The parties were alike engaged in an attempt at robbery and the pretended wagers merely afforded a common field of operations. In this view it seems unnecessary to consider here whether our Gaming act in declaring gambling transactions unlawful, and at the same time authorizing a recovery of money paid for a period of six months only, defines a policy of this state in transactions of that nature which is operative to deny to the courts of this state the right to extend such relief, or is operative to deter this court in extending such relief, after that period has expired, by reason of a longer period for recovery being prescribed by the statute of the foreign state where the transaction occurred.

I will advise a decree dismissing the bill.