By contract dated June 26th, 1939, Mutual Theatre Company sold to the defendant R.L.S. Corporation the Palace and Colonial theatres in Orange. The defendant Samuel Schechner was one of the principal stockholders and an officer of R.L.S. Corporation and represented it in the negotiations leading to the purchase of the theatres. The complainants allege that at and prior to the time of the purchase, Schechner was their confidential agent or broker, negotiating the purchase by complainants of the same two theatres; that he betrayed their trust in buying for his own company, and they pray that the R.L.S. Corporation be compelled to convey the property to complainants at the price it paid for them. The defendants deny that Schechner was the complainants' agent or broker, or that there was any confidential relation between them. I need not, however, consider the issue so raised, or several other defenses.
The complainants, Ledirk Amusement Co., Inc., and Colonial Theatres, Inc., have been the lessees and operators of the Palace and Colonial theatres since 1930. Moe Kridel and his sons, Jerome and Myron, are the only stockholders of *Page 604 
both corporations. The father is president and determines matters of policy; Jerome is treasurer and active executive of the companies. By agreement dated April 30th, 1938, the complainants' rent had been greatly reduced and the leases on the theatres extended to 1959. The two theatres were encumbered by a mortgage held by the Reconstruction Finance Corporation, which was in arrears in the summer of 1939. On August 11th, 1939, Kridel contracted to buy a large lot adjacent to the Palace Theatre to use for parking.
Kridel and Schechner had been friends for many years, but they had never had business transactions with each other. A few days after the purchase of the parking lot in August, 1939, Mr. and Mrs. Schechner were at the Kridel home for an evening of bridge. The game over, Kridel and Schechner chatted. Kridel, who had had for years an inclination toward owning the theatres, remarked that he would like to buy them but was unwilling to do so unless the mortgage situation were cleared up. Schechner was in the real estate business and was the mortgage correspondent of the Connecticut Mutual Life Insurance Company. He said he thought he could get from his company a new mortgage on the property and that if he placed the mortgage, he would be in a position to get the property for Kridel. He showed Kridel that a purchase would save a very large amount of rent. After that evening, Kridel frequently asked Schechner about his progress in placing the mortgage. Schechner did succeed in negotiating a loan of $70,000 to the Mutual Theatre Company and the mortgage was delivered November 14th, 1939.
Complainants allege that they employed Schechner at a certain conference or meeting shortly after November 14th, 1939, when the Mutual Theatre mortgage was given. Schechner divulged the fact that he was now sole or exclusive agent of Mutual Theatre Company for the sale of the theatres. He said that if the Kridels were in a position to buy and could put up a small amount of cash, then they were the ones he would get the properties for. He pointed out that by owning the properties, they would save a considerable amount of money over the term of the lease. Kridel replied he was ready to put up the money and take the properties. Schechner *Page 605 
concluded by urging them not to discuss the matter with Brothers, the owner of Mutual Theatre Company, or with anyone else, but "leave it entirely to me and you will get these properties."
On January 1st, 1940, Kridel went to Florida and remained there until about April 15th. Shortly after he returned, he talked with Schechner and asked what was doing. He replied, "I am working on it" and "be patient." Early in June, they had another conversation in which Schechner reported that the matter was coming to a head; he thought he could get the theatres for $125,000 or $130,000, or so, and that the cash required would be about $25,000; he asked if they were able to go through with the deal on that basis. They answered that they were ready and able and told him to go ahead with it.
If we accept the Kridels' evidence at face value, it is clear that they believed they were dealing with the man who had been engaged by the Mutual Theatre Company as exclusive agent or broker to effect the sale of the property. Moe Kridel testified that he so understood. Again, asked if he had agreed to compensate Schechner for his services, he replied: "A broker gets his commission from the seller. I didn't hire him. He gave his word and he had the exclusive sale and he is working on it." The proofs are susceptible of the interpretation that complainants were all the time dealing with Schechner as agent of the Theatre Company, and that they never employed him or accepted his services as their own broker. "As a general rule, though subject to many exceptions the same person may not represent opposite parties. An agent employed by one party is presumed, throughout the transaction, to be acting for that principal and not for the opposite party. * * * The fact that one party puts faith in the agent of another, does not shift the agency." Rocco v. Geiger,113 N.J. Eq. 583. I think complainants failed to show that they ever employed Schechner or authorized him to act as their agent. But let us assume that complainants' view of the proofs is correct.
If Schechner, to complainants' knowledge, owed a duty to the Mutual Theatre Company which was incompatible with *Page 606 
the service they expected of him, they cannot recover.Sternberger v. Young, 73 N.J. Eq. 586. They attempt to avoid this situation by proving they were mistaken in believing Schechner to be the exclusive broker of the theatre owner. He was merely one of several brokers with whom the property was listed, and even the listing was not made until about May, 1940 — six months after complainants accepted his tender of services. But this fact does not aid complainants. The doctrine of unclean hands is based upon conscience and good faith; it repels a suitor whose conduct has been morally reprehensible. It does not apply if he acted in ignorance of the facts which supply the basis of the charge. Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387.
And conversely the maxim operates if what complainant mistakenly believed to be the fact, brings his conduct within the condemnation of equity. Pendleton v. Gondolf, 85 N.J. Eq. 308.
The complainants rely on Rogers v. Genung, 76 N.J. Eq. 306,
as authority for the proposition that Schechner's engagement by them was permissible though they knew he was agent for the owner. The defendant in that case was a real estate broker with whom property had been "listed" by the owner and whom the owner had promised to pay a commission if he produced a purchaser and the purchaser and the owner could agree upon terms. All that was expected of him was a person ready to enter into negotiations. The court held that he was at liberty to accept employment from a prospective purchaser and to represent the purchaser in negotiations with the owner.
But the situation as complainants saw it was very different. Schechner was the exclusive agent, the sole person on whom Brothers was relying to bring about a sale. Even though Schechner was not empowered to fix a price and to agree upon terms of sale, he was under a duty to Brothers to exert his best efforts to accomplish results most advantageous to the owner. Kelleher v.Bragg, 96 N.J. Eq. 25; 97 N.J. Eq. 547. He owed undivided devotion to his principal, the owner. Chester v. Campbell,91 N.J. Eq. 335; Restatement — Agency § 391. *Page 607 
In some instances, there is no legal or practical impediment to one person acting as broker for both parties, but there must be the fullest disclosure to each principal that the broker is acting for both, in order that the principals may deal at arms length. Marsh v. Buchan, 46 N.J. Eq. 595. Complainants do not bring themselves within the exception. Certainly they did not expect Schechner to tell Brothers he was acting for them or even that they were eager to buy. Though the Kridels had long been on friendly terms with Brothers and saw him frequently, they obeyed Schechner's injunction, "Don't mention it to Brothers."
What service did the Kridels expect of Schechner? They knew Brothers was in financial straits; he had attempted suicide a few years earlier; he was drinking heavily; he was relying on their intimate, Schechner — on him alone — to effect a sale of his property. They would reap the crop which fate had sown. Schechner would get them the property at a rock bottom figure. It is noticeable that no price was mentioned in the fall of 1939, or until June, 1940. The Kridels did nothing to hurry the negotiations, but waited patiently for six months, desirous as they were to buy. It appears to me a permissible inference that they were giving Schechner time to report to his principal that nobody seemed to want the property, that the war made capital hesitant, c.; they were giving Brothers time to revise lower and lower his idea of the worth of the theatres. Nor does it matter if this inference is too strong. The rule which prohibits an agent or other fiduciary from acting for a party whose interests are adverse to his principal, is not limited to cases in which the agent is actually false or the principal is harmed. The rule steps in to ban the situation where opposing interests will compete for the agent's loyalty. Restatement — Agency, § 389.
In the spring of 1940, Brothers was taken with the illness of which he died a year later. Schechner still counseled patience, but a few weeks later he reported to Kridel that matters were coming to a head; that he thought he could get the property for $125,000 or $130,000. As little as that. The leases, before revision, had reserved rent rising to $40,000 a year, and as reduced in 1938, the yearly rent was *Page 608 
$24,000, and after 1941 would be $28,000. Kridel immediately said the suggested price was satisfactory.
When Kridel learned of the sale to R.L.S. Corporation and Schechner pretended it had been negotiated by another broker, he was amazed. "Sam, you told me nobody could sell this property but you." To the last, complainants relied upon Schechner's confidential relation to the owner.
Schechner's testimony is utterly in contradiction of the Kridels' — I believe neither side altogether. But it is unecessary to find the real facts, since on the complainants' case, their bill must be dismissed. *Page 609