Thomas J. McADAM, Jr., McAdam Electric Company, Inc., a New Jersey Corporation, McAdam Pension Plan, and McAdam Electric Profit Sharing Plan

v.

DEAN WITTER REYNOLDS, INC. and Clifford B. Murray

v.

Harold TYSON and Midlantic National Bank, Martin S. Wilson, Philadelphia Life Insurance Company, Professional Benefit Consultants, Inc., McAdam Electric Company, Thomas J. McDonough, Jr., Scott A. Conesky, Theresa Conesky, Edward H. Kay, Regina A. Kay, Margaret White, Elmer J. Parsons, Jr., Nancy L. Parsons, John J. Sykes, Jr., Eleanor Downer, S. Whitney Downer, Lucille Robertson, Gwenn Graves Hamilton, Robert Brown, Beverly A. Brown and Mary L. Brown.

Appeal of DEAN WITTER REYNOLDS, INC., in No. 89–5250.

Appeal of MIDLANTIC NATIONAL BANK/SOUTH in No. 89–5251,

Morgan Guaranty Trust Company of New York, Appellee, No. 89–5251.

Nos. 89–5250, 89–5251.

United States Court of Appeals, Third Circuit.

Argued Sept. 6, 1989.

Decided Feb. 13, 1990.

Rehearing and Rehearing In Banc Denied March 16, 1990.

---

Jonathan L. Goldstein (argued), Richard K. Coplon, Jeffrey Speiser, and Jerrald J. Hochman Hellring, Lindeman, Goldstein, Siegal, Stern & Greenberg, Newark, N.J., for appellant, Dean Witter Reynolds, Inc.

Charles H. Hoens, Jr. (argued) and Helen E. Hoens, Lum, Hoens, Conant & Danzis, Roseland, N.J., for appellant, Midlantic Nat. Bank/South.

Peter S. Greenberg (argued), Jeffrey W. Golan, and Margaret Chon, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees, Thomas J. McAdam, Jr., McAdam Elec. Co., Inc., McAdam Pension Plan, and McAdam Elec. Profit Sharing Plan.

William John Kearns, Jr. (argued), Kearns & Kearns, Willingboro, N.J., for appellee, Morgan Guar. Trust Co. of New York.

Before BECKER and COWEN, Circuit Judges, and WEIS, Senior Circuit Judge.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal arises out of a long and complex jury trial. The appellants, Dean Witter Reynolds, Inc. ("Dean Witter") and Midlantic National Bank/South ("Midlantic"), appeal the district court's entry of a judgment against them and in favor of the appellees, Thomas J. McAdam, Jr., McAdam Electric Company, McAdam Pension Plan, and McAdam Electric Profit Sharing Plan ("McAdam"). Midlantic also appeals the district court's entry of a judgment against it and in favor of appellee Morgan Guaranty Trust Company of New York ("Morgan"). Morgan was a defendant below, but was successful in its cross-claim against Midlantic.

The appellants raise numerous issues on appeal relating to their liability, and the award of compensatory damages, punitive damages and prejudgment interest against them. In addition, Midlantic objects to the award of attorneys' fees to Morgan on its successful cross-claim. Because we find no reversible error in the decisions of the district court involving liability, prejudgment interest, compensatory or punitive damages, we will affirm the judgments in favor of McAdam and against Dean Witter and Midlantic. However, because we find that the district court erred in awarding attorneys' fees to Morgan on its cross-claim against Midlantic we will vacate that portion of the judgment in favor of Morgan.

## I.

## BACKGROUND

In 1980, McAdam opened several nondiscretionary investment accounts with Clifford B. Murray ("Murray"), an account executive with the brokerage firm of Dean Witter. These accounts were opened in the name of McAdam, his company, and the company's pension and profit-sharing plans. All of the funds were invested in safe, liquid investments. McAdam received monthly statements from Dean Witter reflecting the transactions made in these accounts.

In the latter part of 1980, Murray informed McAdam of a "special" investment opportunity that Murray said Dean Witter offered only to its preferred customers. Murray represented to McAdam that this "special" investment opportunity offered both a low risk and a high return. Murray also told McAdam that this account would not show up on his monthly Dean Witter statements, but that Murray would personally advise him of its status. Except for an assurance that drug money was not involved, McAdam was never informed of how this "special" account operated nor of its underlying securities. Nevertheless, McAdam testified that over the next few years he wrote out numerous checks to Murray for investment in the "special" account on behalf of himself, his company, and his company's pension and profit sharing plans. These checks were always made

payable to Murray and, according to McAdam, totalled approximately $460,000.00.

The "special" account was later revealed to be an elaborate and fraudulent scheme set up by Murray, but not before numerous Dean Witter investors had already transferred sizable funds to Murray based on similar representations.[1] The sheer size of this scheme eventually forced Murray to make unauthorized raids on the nondiscretionary Dean Witter accounts of his regular customers, including McAdam. As the "special" account investors became increasingly impatient with the lack of the anticipated return on their investment, Murray began surreptitiously selling off securities in nondiscretionary accounts he managed and causing checks, payable to the account's owner, to be drawn by Dean Witter reflecting the balance from these sales. Murray would then forge his customers' endorsements on the checks and cash them at Midlantic.[2] With the proceeds from the forged checks, Murray attempted to mollify impatient "special" account investors by returning what he told them was "principal" on their investment. Incredibly, this financial juggling continued undetected for four years.

Thus, as he did with other "special" account investors, Murray periodically discussed the status of the "special" account with McAdam, always stressing that the account was doing fine and occasionally returning some of McAdam's investment "principal." The amount of the funds returned by Murray is contested by the parties. On direct examination, McAdam testified that Murray returned $162,000. However, the appellants developed evidence from which a jury could have found that a much higher figure had been returned.[3]

It is clear that both Dean Witter and Midlantic helped facilitate Murray's scheme by failing to follow their own internal policies and procedures. For example, the jury heard evidence that Dean Witter failed to enforce its own policy both that all correspondence between a customer and an account executive must be reviewed by a supervisor and that all account executives must keep a daily diary from which a supervisor is supposed to review an account executive's activities. Furthermore, it was Dean Witter's written policy that any time a check was made payable to a customer and was subsequently handled by an account executive, that account executive must fill out a check receipt form, a supervisor must authorize the transaction, and the account executive must later obtain the customer's signature on the form acknowledging receipt of the check. This procedure was also not followed with regard to Murray and the forged checks.

Likewise, the jury heard testimony that Midlantic's supervisors deliberately broke

1. Murray claims he actually did invest the funds in a New York investment account run by his Dean Witter supervisor, Harold Tyson. Yet, Murray could give virtually no details about this account and, of course, Harold Tyson denied the existence of any such off-the-books investment account at the brokerage firm. Moreover, we note that Murray has pled guilty to both state and federal charges of defrauding and misappropriating investors' funds and is now in prison.

2. This case was tried on the theory that Midlantic was both a collecting bank and a depositary bank under the Uniform Commercial Code. *See* N.J.Stat.Ann. § 12A:4–105(a), (d) (West 1962). *See generally* J. White & R. Summers, Uniform Commercial Code § 15–1, at 652–55 (3d ed. 1988); 5 W. Hawkland, F. Leary & R. Alderman, Uniform Commercial Code Series § 4–105:02 (1984). No objections were raised as to this characterization or the consequences flowing from it. Thus, we will assume, without

deciding, that Midlantic is both a collecting and depositary bank for purposes of this litigation. However, we note that some courts have questioned, at least for some purposes, such a characterization. *See Knesz v. Central Jersey Bank and Trust Co. of Freehold,* 97 N.J. 1, 11 n. 2, 477 A.2d 806 (1984); *Denn v. First State Bank of Spring Lake Park,* 316 N.W.2d 532, 536 (Minn. 1982); *Board of Higher Educ. of the City of N.Y. v. Bankers Trust Co.,* 86 Misc.2d 560, 383 N.Y. S.2d 508, 511 (N.Y.Sup.Ct.1976); 6 R. Anderson, Uniform Commercial Code § 4–105:4 (3d ed. 1984). To avoid confusion, we will refer to the status of both Midlantic and other similarly situated banks as "initial collecting banks."

3. Whether the returned funds consisted of monies McAdam had given directly to Murray to invest in the "special" account or whether the funds consisted of monies Murray later acquired from cashing checks containing forged endorsements made payable to McAdam is, of course, unclear.

or disregarded the bank's established rules and regulations concerning check cashing policy whenever a Dean Witter employee was involved in a transaction. Specifically, employees of the bank routinely cashed third-party checks for Murray, even though the checks were not drawn on Midlantic Most of these third-party checks were quite large, including one for $475,000 payable to a Dean Witter customer's pension plan which, according to Murray, required the use of a suitcase to carry the cash out of the bank. Indeed, there was evidence showing that Murray cashed at least 120 third-party checks at Midlantic over a period of two years, totalling somewhere between $3–4 million. Employees of Midlantic also cashed checks payable to business entities, such as McAdam Electric Company, and pension and profit sharing plans, all in violation of the bank's policies. Such disregard for policy continued even after bank supervisors were warned of Murray's profligate check cashing. All of the forged checks were eventually presented by Midlantic to Morgan for payment.[4] The forged checks that belonged to McAdam, but which were cashed by Midlantic and paid by Morgan, totalled $466,992.71.

Evidence was also presented to the jury that once the scheme was uncovered in 1984, the lack of funds in McAdam's Dean Witter corporate accounts led to a dramatic effect on his company's profit picture. Both McAdam and his usual bonding agent, Richard H. Shepherd, testified that once word got out that McAdam and his company had suffered sizable losses due to a fraudulent scheme, it became extremely difficult for McAdam to secure the necessary bonding required for the large contracting projects his company had worked on prior to 1984. McAdam testified that this lack of bonding led to sizable lost business profits because contracting jobs which require no bonding are less profitable and highly competitive.

Thereafter, McAdam brought suit in state court against Murray and Dean Witter. The case was later removed to federal district court and consolidated for trial with another action brought by McAdam against Murray, Dean Witter, Midlantic and Morgan. McAdam's complaint alleged that Murray had committed fraud, breach of contract, breach of fiduciary duty and failed to pay McAdam for checks drawn on McAdam's investment accounts and made payable to him, in violation of N.J.Stat. Ann. § 12A:3–804 (West 1962). The complaint, at least as interpreted by the district court and as submitted to the jury, alleged that Dean Witter was vicariously liable to McAdam for Murray's breach of contract and fiduciary duty, and directly liable to McAdam for fraud, negligent supervision and for violating § 12A:3–804 as well. Morgan and Midlantic were alleged to have converted the forged checks in violation of N.J.Stat.Ann. § 12A:3–419(1)(c) (West 1962). In addition, McAdam charged that Murray, Dean Witter and Midlantic had all violated federal and state securities laws, as well as the federal R.I.C.O. Act, 18 U.S.C. § 1961–1968 (Supp. V 1987). Later in the litigation, Morgan brought a cross-claim against Midlantic for breach of its presentment warranty of good title to the forged checks, in violation of N.J.Stat.Ann. § 12A:4–207(1) (West 1962).[5]

The jury returned a verdict in the form of special interrogatories. The jury found for the appellants on the fraud, securities violations, and R.I.C.O. counts. However, the jury found Dean Witter directly liable to McAdam for negligent supervision[6] and vicariously liable for Murray's breach of contract and fiduciary duty. The jury assessed damages on these counts at $448,-247. The jury also found Dean Witter liable on the UCC count and assessed dam-

---

**4.** For purposes of this case, Morgan is both the drawee bank and the payor bank under the Uniform Commercial Code. *See* N.J.Stat.Ann. § 12A:4–105(b) (West 1962).

**5.** For simplicity, in the remainder of this Opinion we will omit New Jersey's "12A" prefix to its version of the Uniform Commercial Code ("UCC") when we are not officially citing to the statute.

**6.** On the negligence count, the jury found that McAdam was 35% comparatively responsible for his injuries stemming from that breach.

ages on that count at $145,140.[7] The jury found Midlantic liable to McAdam for conversion in violation of § 3–419(1)(c) and assessed damages at $466,992.71, the face amount of the cashed forged checks. Based on the jury's factual findings, the district court also found in favor of McAdam on his conversion count against Morgan, but in favor of Morgan on its cross-claim against Midlantic. Finally, the jury found that McAdam was entitled to punitive damages of $800,000 against Dean Witter, and $500,000 against Midlantic.

After rejecting the defendants' post-trial motions, the district court entered a judgment in accordance with the jury's findings: in favor of McAdam and against Dean Witter in the amount of $1,482,070, inclusive of punitive damages and prejudgment interest; in favor of McAdam and against Midlantic and Morgan, jointly and severally, in the amount of $729,694.71, inclusive of prejudgment interest; in favor of McAdam and against Midlantic in the amount of $500,000 for punitive damages; and in favor of Morgan and against Midlantic for $729,694.71, plus an amount for attorneys' fees to be determined by the parties. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982).

## II.

### LIABILITY

#### A. *Appellant Dean Witter.*

We first consider the appellants' arguments which involve the issue of liability. Dean Witter argues that the district judge erred in refusing to allow the jury to consider its defense of *in pari delicto.*[8] The district court did not allow the defense because it found that McAdam's conduct in

---

**7.** The district court ultimately subsumed this latter figure into McAdam's recovery against Midlantic.

**8.** We assume, without deciding, that by virtue of being held vicariously liable for Murray's actions, Dean Witter can raise this defense in his stead.

**9.** "[I]n cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there

this affair did not satisfy the legal requirement for maintaining the defense. Since the resolution of this issue involves the application of a legal precept, our scope of review is plenary. *United States v. Adams,* 759 F.2d 1099, 1106 (3d Cir.), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985).

■ The common law defense of *in pari delicto* "is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 2626, 86 L.Ed.2d 215 (1985) (footnotes omitted). *See generally* 30 C.J.S. *Equity* § 94 (1965). The defense derives from the Latin maxim, *in pari delicto potior est conditio defendentis,* which means: "In a case of equal or mutual fault ... the position of the party ... [defending] is the better one." Black's Law Dictionary 711 (5th ed. 1979). *See generally* 1 Am.Jur.2d *Actions* § 52 (1962). Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated. *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 2073, 100 L.Ed.2d 658 (1988).[9] The defense is the legal corollary of the equitable unclean hands doctrine which requires not even equal fault on the part of the plaintiff in order to bar the lawsuit. *Rothberg v. Rosenbloom,* 808 F.2d 252, 256 n. 6 (3d Cir.1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 501 (1987).[10]

---

may be, and often are, very different degrees in their guilt." *Bateman Eichler,* 472 U.S. at 307, 105 S.Ct. at 2627 (quoting 1 J. Story, Equity Jurisprudence 304–305 (13th ed. 1886)).

**10.** Since McAdam in this appeal only seeks damages, the unclean hands doctrine is not applicable. *See Tarasi v. Pittsburgh Nat'l Bank,* 555 F.2d 1152, 1156 n. 9 (3d Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977).

■ Moreover, in order to bar recovery, the plaintiff must be an active, voluntary participant in the unlawful activity that is the *subject of the suit*. *Pinter*, 108 S.Ct. at 2073. *See also Woolf v. S.D. Cohn & Co.*, 515 F.2d 591, 604 (5th Cir.1975), *vacated and remanded on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976) ("plaintiff must be an active, essential, and knowing participant in the unlawful activity"). "Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 153, 88 S.Ct. 1981, 1992, 20 L.Ed.2d 982 (1968) (Harlan, J., concurring in part and dissenting in part). In determining whether the plaintiff was a participant in the unlawful activity, "a court may look only to conduct associated with the transaction before it, and may not forbid recovery on account of a plaintiff's activities in a separate setting." *Tarasi v. Pittsburgh Nat'l Bank*, 555 F.2d 1152, 1157 (3d Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977).

■ Thus, the *in pari delicto* defense in its traditional formulation is limited to situations where the plaintiff, as a direct result of his own actions, bears at least substantially equal responsibility for the underlying illegality. *Bateman Eichler*, 472 U.S. at 307, 105 S.Ct. at 2627. While there has been little discussion of the defense in recent cases, the New Jersey courts have given a traditional construction to the defense in earlier actions based on New Jersey law.[11] For example, in *Pendleton v. Gondolf*, 85 N.J.Eq. 308, 96 A. 47 (Ch.Ct. 1915), the court explained that:

In the law courts a similar principle [to the equitable doctrine of unclean hands] is recognized, but in its application cases are to be found in which the *courts incline to measure the comparative guilt of the respective parties* and extend relief to one who is comparatively innocent; that situation has been usually presented in cases in which the wrongful conduct of the party seeking relief has arisen through undue influence arising from a trust relationship of the parties, through mental weakness, threats, fear, or oppression and like circumstances which have been regarded as sufficient to measurably excuse the wrongful conduct involved.... I am unable to find any justification for a court ... to extend relief to a suitor who has been guilty of conduct involving *the degree of moral turpitude of that which is involved in the very transaction which forms the basis of the relief sought when that conduct and the turpitude involved in it have been impelled by the deliberate and intelligent purposes of the rational and normal intellect of a free agent....*

*Pendleton*, 96 A. at 50 (emphasis added). *See also Pennsylvania Greyhound Lines v. Rosenthal*, 14 N.J. 372, 386, 102 A.2d 587 (1954); *Schoharie County Coop. Dairies v. Eisenstein*, 22 N.J.Super. 503, 513–15, 92 A.2d 390 (App.Div.1952) ("there is authority for the proposition that the less guilty party to an illegal transaction will not be considered in pari delicto"); *Greene v. Birkmeyer*, 8 N.J.Super. 217, 220–21, 73 A.2d 728 (App.Div.1950); *Appell v. Reiner*, 81 N.J.Super. 229, 242, 195 A.2d 310 (Ch. Div.1963), *rev'd on other grounds*, 43 N.J. 313, 204 A.2d 146 (1964).

Given that the "substantially equal responsibility for the underlying illegality" standard is the one to be applied in this case, we do not find evidence sufficient for reasonable persons to infer McAdam's active and voluntary participation in Murray's fraudulent scheme, i.e., the unlawful activity that is the subject of this suit. *See Pinter*, 108 S.Ct. at 2073; *Pendleton*, 96 A. at 50 (*in pari delicto* defense available when plaintiff's "conduct can only be regarded as having been voluntary and intelligent in its purpose"). The fact that McAdam engaged in off-the-book transactions with Murray—as did many other defrauded investors—wrote sizable checks made payable to Murray, and, under Murray's ad-

---

11. Since Dean Witter was not found liable on any count involving federal law, we need not address whether the district court was in error in disallowing the defense as to those counts. Such error would be harmless.

vice, kept secret what McAdam believed to be a preferred customer account that was not open to the public, does not amount to willful, voluntary involvement in an *illegal* enterprise. There is no evidence that Murray confided in McAdam and thus that McAdam knew of Murray's fraudulent scheme when he "invested" his money. Foolish credulity is not equivalent to culpability for purposes of the *in pari delicto* defense, *see, e.g., Eisenstein,* 22 N.J.Super. at 514, 92 A.2d 390, and neither is simple greed or a desire to make money. *See Rothberg,* 808 F.2d at 256–57. Moreover, even assuming that McAdam misrepresented his "special" account investments to his bonding company and the amount of his income to the I.R.S., such fraudulent or illegal conduct is not the underlying illegality which forms the basis of this suit and, therefore, is irrelevant to the determination of whether the defense is available. *See Pinter,* 108 S.Ct. at 2073.[12] Consequently, we will affirm the district court's ruling on the inapplicability of the *in pari delicto* defense.[13]

### B. *Appellant Midlantic.*

Midlantic argues that § 3–405(1)(c) of the UCC—the so-called "faithless employee" defense—bars McAdam from recovering against it as to the forged endorsement losses. Section 3–405(1)(c) reads in relevant part:

(1) An endorsement by any person in the name of the named payee is effective if

. . .

(c) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.

N.J.Stat.Ann. § 12A:3–405(1)(c) (West 1962). In this case, an employee (Murray) of the drawer (Dean Witter) supplied the drawer with the name of the payee (McAdam) intending that McAdam have no interest in the instrument. Since all of the elements of § 3–405(1)(c) are met, Midlantic argues that it was legal error for the district court to hold that the defense was unavailable to the bank. McAdam counters that § 3–405(1)(c) should either be interpreted so as not to bar suits by payees—as opposed to drawers such as Dean Witter—against collecting banks, or not be available to Midlantic because of its bad faith conduct in cashing the checks containing forged endorsements.

In deciding this issue, we are required to apply the substantive law of the forum state, New Jersey. *E.g.,* 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3567.1, at 145 (1971). However, the New Jersey Supreme Court has not addressed the specific questions we now confront. *Cf. Brighton, Inc. v. Colonial First Nat'l Bank,* 176 N.J.Super. 101, 422 A.2d 433 (App.Div.1980), *aff'd per curiam,* 86 N.J. 259, 430 A.2d 902 (1981) (drawer/employer suing collecting and drawee banks); *Kraftsman Container Corp. v. United Counties Trust Co.,* 169 N.J.Super. 488, 404 A.2d 1288 (Law Div. 1979) (drawer/employer suing drawee bank). Therefore, we must predict how the Supreme Court of New Jersey would decide the issue. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981). Hence, our scope of review is plenary. *See Oliver v. Raymark Indus.,* 799 F.2d 95, 96 (3d Cir.1986).

■ We predict that the New Jersey Supreme Court would hold that § 3–405(1)(c)

12. Alternatively, the jury's comparative negligence finding that McAdam was only 35% responsible for his injuries and its finding that McAdam did not substantially contribute to the forgeries are a good indication that the jury also believed that McAdam did not bear *substantially equal* responsibility for his injuries. App. at 124, 128 (Jury Verdict Form, answers to special interrogatories # 12, 35).

13. We do not read *Ryan v. Motor Credit Co.,* 130 N.J.Eq. 531, 23 A.2d 607 (Ch.Div.1941), *aff'd,* 132 N.J.Eq. 398, 28 A.2d 181 (N.J.Err. & App.

1942), as standing for the proposition that a finding of whether a party is *in pari delicto* is always a fact issue for the jury, or the court sitting without a jury, as Dean Witter contends. Rather, *Ryan* stands for the quite different proposition that whether a party to an illegal, i.e., *malum prohibitum,* contract can be *in pari delicto* when the statute imposes a fine *only* on the other party is a question for the jury to decide and thus should not be determined by use of irrebuttable presumptions.

is unavailable in a suit between a payee and an initial collecting bank at least when the bank converts checks with forged endorsements in violation of the good faith requirement of the UCC.[14] *See* N.J.Stat. Ann. §§ 12A:1–203 (1962). Thus, we find that the district judge did not err in holding that the defense was unavailable to Midlantic under the facts of this case.

As part of an attempt to establish uniform rules governing the relationship between banks and their customers, the UCC allocates the losses caused by forged endorsements on negotiable instruments based on the relative responsibilities of the parties to a transaction. *Western Casualty & Sur. Co. v. Citizens Bank of Las Cruces,* 676 F.2d 1344, 1345 (10th Cir.1982); Hayes, *U.C.C. Section 3–405: Of Imposters, Fictitious Payees, and Padded Payrolls,* 47 Fordham L.Rev. 1083, 1083 (1979). *See also Hanover Ins. Cos. v. Brotherhood State Bank,* 482 F.Supp. 501, 507–08 (D.Kan.1979). Generally, a drawee bank is not entitled to debit the drawer's account when the bank pays over a forged endorsement, *see, e.g.,* J. White & R. Summers, *supra,* § 15–1, at 652; *Kraftsman,* 169 N.J.Super. at 493, 404 A.2d 1288, because an "unauthorized signature is wholly inoperative as that of the person whose name is signed." N.J.Stat.Ann. § 12A:3–404(1) (West 1962). *See also* N.J.Stat.Ann. §§ 12A:4–401(1), 12A:3–417 Uniform Commercial Code comment 3 (West 1962). However, a drawee bank which has paid over a forged endorsement can shift the loss "upstream" to previous endorsers, e.g., collecting banks, by way of an action for breach of warranty of good title. N.J. Stat.Ann. §§ 12A:3–417(1)(a), 12A:4–207(1)(a) (West 1962). *See Western Casualty,* 676 F.2d at 1345; *Perini Corp. v. First Nat'l Bank of Habersham County,*

553 F.2d 398, 404 (5th Cir.1977); J. White & R. Summers, *supra,* 15–1, at 653–55.[15] Ultimately, the "loss falls on the party who took the check from the forger, or on the forger himself." *Perini,* 553 F.2d at 404. *See also* Hayes, *supra,* at 1085. Thus, the drawer of the check can usually avoid liability on a check with a forged endorsement simply by showing the unauthorized endorsement and the depositary or initial collecting bank will likely suffer the loss. *Western Casualty,* 676 F.2d at 1345; *Perini,* 553 F.2d at 404; Harbus, *The Great Pretender—A Look at the Imposter Provision of the Uniform Commercial Code,* 47 Cinn.L.Rev. 385, 386 (1978).

Section 3–405(1)(c) creates a limited exception to this general rule when an employee, intending the payee to have no interest in the instrument, causes his employer to draw a check made payable to a customer of the employer. This exception is created because of the differing responsibilities of the parties in such a situation. Banks are shielded from liability because of the

> feeling, largely unarticulated, that the loss should be taken by the drawer (employer). His employee, acting within the scope of his authority, caused the loss; he is in the best position to prevent it by supervision and by using care in hiring employees; he has as good a chance as the bank to distribute the risk to all of society through the use of insurance.

N.J.Stat.Ann. § 12A:3–405, New Jersey study comment 1 (West 1962). *See also Brighton,* 176 N.J.Super. at 112, 422 A.2d 433; § 12A:3–405, Uniform Commercial Code comment 4. Thus, the statute was designed to bar suits by drawer/employers against banks on forged endorsements be-

**14.** No objection has been raised as to the ability of McAdam to bring a conversion suit under the UCC against Midlantic and, therefore, we do not address that issue. *See* J. White & R. Summers, *supra,* § 15–5, at 664–65 & n. 7 (arguing that a court should not recognize a conversion cause of action by a payee who has neither received actual nor constructive possession of the check, and citing a split in authority on the issue). *Compare Humberto Decorators, Inc. v. Plaza Nat'l Bank,* 180 N.J.Super. 170, 174–75, 434 A.2d 618 (App.Div.1981) (requiring at least constructive delivery) *with Nutt v. Chemical Bank,* 231 N.J.Super. 57, 62, 555 A.2d 8 (App.Div.1989) (no such requirement addressed).

**15.** Of course, a different analysis would apply and a different result would ensue if the checks in this case contained forged drawer signatures rather than forged endorsements. *See Perini,* 553 F.2d at 404–05.

cause normally the employer is in a better position, through careful business practices, to prevent such financial abuses by its employees or, at least, ameliorate the consequences. *Brighton*, 176 N.J.Super. at 112, 422 A.2d 433. *See also* J. White & R. Summers, *supra*, § 16–4, at 700; McDonnell, *Bank Liability for Fraudulent Checks: The Clash of the Utilitarian and Paternalist Creeds Under the Uniform Commercial Code*, 73 Geo.L.J. 1399, 1410, 1411 (1985); Hayes, *supra*, at 1102, 1105, 1110. *Cf. National Credit Union Admin. v. Michigan Nat'l Bank of Detroit*, 771 F.2d 154, 159–60 (6th Cir.1985); *United States v. Bank of Am. Nat'l Trust and Sav. Ass'n*, 438 F.2d 1213, 1214 (9th Cir.), *cert. denied*, 404 U.S. 864, 92 S.Ct. 54, 30 L.Ed.2d 108 (1971); *New Amsterdam Casualty Co. v. First Pa. Banking and Trust Co.*, 451 F.2d 892, 897 (3d Cir.1971) (construing same section under Pennsylvania law).

█ The rationale for the § 3–405(1)(c) exception, however, does not easily extend to lawsuits brought by *payees* against initial collecting banks. A payee, unlike the drawer/employer, is not in a better position than the bank to prevent such financial abuses. The faithless employee is not the payee's employee. Consequently, the payee can not prevent such abuses through careful hiring or supervising practices. Nor can the payee spread the risk of forgery losses throughout society by means of fidelity insurance. Importantly, as between the payee and an initial collecting bank, the bank is clearly in a better position both to prevent, or minimize, forgery losses through proper and careful banking procedures, *cf. Perini*, 553 F.2d at 406 ("such simple expedients as requiring identification ... may still permit transferees of checks to provide a significant protection against forged indorsements that drawees cannot"); Comment, *The Effect of Bank Misconduct on the Operation of the Padded Payroll Preclusion of U.C.C. § 3–405*, 26 UCLA L.Rev. 147, 153 n. 44 (1979), and to socialize the cost of forgery losses by

incorporating insurance costs into its banking charges. McDonnell, *supra*, at 1428.[16]

There appear then to be good reasons for allowing payees to sue initial collecting banks despite § 3–405(1)(c), at least when the payee is not simply serving as a litigation front for a drawer/employer who has been the victim of a faithless employee. *See Barnett Bank of Miami Beach v. Lipp*, 364 So.2d 28 (Fla.Dist.Ct.App.1978) (allowing suit under similar facts); Cooter and Rubin, *A Theory of Loss Allocation for Consumer Payments*, 66 Texas L.Rev. 63, 109–10 (1987) (arguing that the most efficient theory of loss allocation for forgeries would entail scrapping the "complex issues about depositary bank negligence, drawer negligence, reasonable commercial standards, imposters, and fictitious payees" and instead imposing strict liability on payees and drawers for a small, fixed amount and allowing recovery against any financial institution involved for the remainder); Harbus, *supra*, at 445 (in the author's proposed draft for a new § 3–405, the statute would not bar suits by payees). Yet, at the same time we understand the appeal of Midlantic's counterargument that the symmetry of the Code's liability scheme would, in general, be disrupted if we failed to limit a payee's avenue of recovery for forgery losses, covered by § 3–405(1)(c), to § 3–804 actions against the drawer/employers. Any other result, the bank contends, would allow the loss to be shifted from the employer/drawer to a bank which is less responsible for, and less able to prevent, the forgery. *But cf. Girard Bank v. Mt. Holly State Bank*, 474 F.Supp. 1225, 1237–42 (D.N.J.1979) (holding, in an analogous situation, that the New Jersey courts would recognize a cause of action by an innocent depositary bank against a negligent drawer under common law principles even though such an action is not sanctioned by the Code).

Fortunately, we need not decide whether *all* conversion claims by payees involving "faithless employees" are proper in resolv-

---

**16.** Furthermore, banks are clearly in a better position to develop technological innovations to help prevent or minimize forgery losses if liability rules create the incentive. Cooter and Rubin, *A Theory of Loss Allocation for Consumer Payments*, 66 Texas L.Rev. 63, 106 (1987).

ing the case before us since we believe Midlantic's symmetry concerns are not paramount when an initial collecting bank has acted in callous disregard of the payee's rights. As we have discussed, § 3–405(1)(c) is intended to allocate the losses resulting from forgeries based on the relative responsibilities of the parties. Rather than utilizing the general rule of the Code and imposing liability on the depositary bank, the "faithless employee" liability rule is supposed to achieve a more socially desirable result by encouraging employers to make prudent personnel decisions.

But clearly the attempt both to achieve the most socially desirable result and to create the proper incentives is frustrated when a bank's commercially outrageous conduct is insulated from legal consequences under § 3–405(1)(c) in order to encourage an employer to be more careful in hiring and supervising its employees. Such extraordinary misconduct simply cannot go undeterred and we will not find that the New Jersey legislature so intended.[17] Section 3–405(1)(c) was not designed to allocate forgery losses when parties act outside commercially foreseeable norms. *Cf. Chartered Bank v. American Trust Co.*, 47 Misc.2d 694, 697–98, 263 N.Y.S.2d 53 (N.Y.Sup.Ct.1965) (interpreting the Fictitious Payee Amendment to the previous statute, § 9(3) of the Uniform Negotiable Instruments Law, to the same effect).

Therefore, we predict that the New Jersey Supreme Court would decide that "the fictitious payee rule is not intended to provide an absolute defense," but instead hold that in order to successfully assert the effectiveness of a forged endorsement un-

der § 3–405(1)(c), the bank must have acted in good faith when paying the instrument. *City of Phoenix v. Great West. Bank & Trust*, 148 Ariz. 53, 712 P.2d 966, 970 (Ct. App.1985). Although there is no specific standard of care set forth in § 3–405, banks are obligated to act in good faith with respect to all their contracts and duties under the Code. N.J.Stat.Ann. § 12A:1–203 (1962). The UCC comments suggest that this includes the § 3–405 context. *See* N.J.Stat.Ann. § 12A:4–406, Uniform Commercial Code comment 6 (1962) ("under the rules relating to imposters and signatures in the name of the payee (Section 3–405) certain forged endorsements *on which the bank has paid the item in good faith* may be treated as effective notwithstanding such discovery and notice") (emphasis added).

Courts in other jurisdictions have interpreted § 3–405 to require that a bank must have acted with at least good faith in order to assert the defense. *Western Casualty*, 676 F.2d at 1347 ("it is clear that banks must observe this standard of good faith ... to invoke the protection of § 3–405") (dictum); *Prudential Ins. Co. v. Marine Nat'l Exchange Bank*, 371 F.Supp. 1002, 1003 (E.D.Wis.1974) ("to the extent that a cashing bank is subject to the 'good faith' requirement ... its defense under [§ 3–405] is, of course, not absolute") (dictum); *City of Phoenix*, 712 P.2d at 970; *Fair Park Nat'l Bank v. Southwestern Inv. Co.*, 541 S.W.2d 266, 270–71 (Tex.Civ.App. 1976) ("the drawer cannot avoid the defense provided in [§ 3–405] without a showing of bad faith"); *Hicks–Costarino Co. v. Pinto*, 23 U.C.C.Rep.Serv. (Callaghan) 680, 682–84 (N.Y.Sup.Ct.1978).[18] *Cf. Travelers*

---

**17.** Moreover, under such circumstances fairness demands that innocent payees should not be limited to recovering against drawer/employers who themselves may often be in serious financial difficulties as a result of their employees' misconduct.

**18.** Midlantic is incorrect in suggesting that *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chemical Bank*, 57 N.Y.2d 439, 456 N.Y.S.2d 742, 442 N.E.2d 1253 (1982), is to the contrary. While the *Merrill Lynch* court does note that "§ 3–405's failure to delineate a standard of care, to which a bank itself must adhere if it is to

advantage itself of this action, was no oversight," *Merrill Lynch*, 456 N.Y.S.2d at 746, 442 N.E.2d at 1257, the court's holding was simply that a drawee, as opposed to a collecting, bank can still assert the defense despite its own *negligence.* Midlantic apparently overlooks that the court immediately after the quotation above explains: "This is not to say that, if a check is 'tainted in *some other way* that would put the drawee on notice, and which would make its payment unauthorized,' a drawee bank may yet not be liable. For instance, a drawee bank surely is not immunized by § 3–405 when it acts dishonestly." *Id.* at 747, 442 N.E.2d at 1258

*Indem. Co. v. Center Bank,* 202 Neb. 294, 275 N.W.2d 73, 76 (1979) ("in the absence of any allegation that the bank either had actual notice or facts sufficient to put it on constructive notice, or in some manner acted in a commercially unreasonable manner," § 3–405 is a valid defense); *McConnico v. Third Nat'l Bank in Nashville,* 499 S.W.2d 874, 886 (Tenn.1973) (while holding that § 3–405 was applicable, the Court found that the bank was nevertheless liable because it "had notice of an irregularity on the face of the instrument"). *See generally* J. White & R. Summers, *supra,* § 16–5, at 710 ("we think it appropriate to regard the imposter and fictitious payee rules of 3–405 as first cousins of the rules in 3–406 and 4–406, and would allow a customer to prove a drawee's negligence and, having proved it, assert the forged instrument"). One New Jersey law division case has already joined this trend by reading into § 3–405(1)(c) such a good faith requirement. *Kraftsman* 169 N.J.Super. at 495, 404 A.2d 1288.

While Midlantic is technically correct that the jury's response of "No" to interrogatory # 32—which asked whether the bank paid "the checks in good faith and in accordance with the reasonable commercial standards of the banking business?" App. at 127—does not definitively establish that Midlantic did not act in good faith, the bank overlooks the fact that the jury found that Midlantic's conduct, in deliberately violating its own stated policies by cashing at least 120, often extremely large, third-party checks totalling between $3–4 million,

(quoting *Underpinning v. Chase,* 46 N.Y.2d 459, 466, 414 N.Y.S.2d 298, 386 N.E.2d 1319 (1979)) (emphasis in the original).

**19.** We affirm this punitive damage award in section IV,B *infra.*

**20.** We are mindful of the wise admonition from White and Summers:
> In our view, there is a general approach to issues of interpretation and construction that is more appropriate than any other. In essence, judges and lawyers should interpret and construe Code words, phrases, and sections in light of their rationales. We will call this a "rationale-oriented" approach. It has the merit of being the one that the Code drafters preferred. And it appears that most courts do today seek to interpret or construe

was so egregious as to warrant punitive damages. *See* App. at 128.[19] We conclude that this finding is sufficient under the circumstances of this case to establish a breach of the UCC's good faith requirement and thus bar Midlantic's § 3–405(1)(c) defense.

In reaching this result, we recognize that since § 3–405(1)(c) is a banker's exception which dramatically departs from the general UCC rule and narrows the liability of a bank, courts should be cautious in expanding the section's scope beyond its explicit rationale. *See* J. White & R. Summers, *supra,* § 16–5, at 710; *Clients' Sec. Fund of the Bar of New Jersey v. Allstate Ins. Co.,* 219 N.J.Super. 325, 331, 530 A.2d 357 (App.Div.1987). Thus, we are convinced that despite the facial applicability of the "faithless employee" defense the general rule of the Code should govern this suit between McAdam and Midlantic.[20] Consequently, we will affirm the decision of the district court that the "faithless employee" defense was unavailable to Midlantic.

### III.

### COMPENSATORY DAMAGES

In its answers to the special interrogatories, the jury found that Dean Witter was liable for Murray's breach of contract and fiduciary duty, and directly liable for negligent supervision.[21] The jury assessed damages on these common law counts in the amount of $448,247.

> Code words, phrases and sections in light of their underlying rationales. Indeed a number of cases stand out as shining examples of this method. Not only is the method more likely to produce results that the drafters intended; it probably also makes for more predictability and uniformity over the long run.

J. White & R. Summers, *supra,* § 4, at 18 (footnotes omitted).

**21.** For simplicity, throughout this Opinion we will refer to the breach of contract, fiduciary duty and negligent supervision causes of action as "the common law counts," and the § 3–804 action against Dean Witter and the § 3–419(1)(c) action against Midlantic as the "UCC counts."

In addition, the jury found Dean Witter liable in the amount of $145,140 for failing to pay McAdam for stolen checks drawn on his investment account and made payable to him, i.e., the forged endorsements. The jury also found Midlantic liable for cashing these checks containing forged endorsements and assessed damages of $466,992.71 against the bank, a figure exactly equal to the face-amount of the cashed checks. As a result of the jury's answers, the district court entered a judgment in favor of McAdam and against Dean Witter for $448,247 and against Midlantic for $466,992.71.[22] The court subsumed Dean Witter's liability for the forged endorsements, the $145,140 figure, into the judgment against Midlantic. Thus, the court held the bank liable for the entire forged endorsement damages.

Dean Witter argues that the district court erred in awarding damages of $448,247 against it *and* also an additional $466,992.71 against Midlantic. This, Dean Witter contends, amounts to a duplicative recovery. Dean Witter's argument proceeds from the premise that when the jury found damages of $448,247 flowing from the common law counts, the jury was, *ipso facto*, finding that the *total* damages McAdam suffered in the case to be $448,247. The rationale for this premise is that since all the legal theories advanced by McAdam, including the UCC causes of action, involve the same acts, conduct and scheme by Murray, McAdam's losses on one count must be, in reality, the same losses as on all the other counts. Therefore, Dean Witter's position is that we should either hold that the verdict is irreconcilable and order a new trial, *see Riley v. K Mart Corp.*, 864 F.2d 1049, 1055 (3d Cir.1988), or, alternatively, hold Dean Witter and Midlantic jointly and severally liable for $448,247.

Midlantic puts a slightly different spin on its objection to the molding of the jury verdict by the district court. The position of Midlantic is that it should only be jointly and severally liable with Dean Witter for $145,140. This figure represents the

amount the jury assessed against Dean Witter as its liability for the forged endorsements. Midlantic argues that the difference between $145,140 and the $466,992.71 actually assessed against the bank, can *only* reflect the amount that the jury believed Murray returned to McAdam as "principal." Midlantic contends that there is no reason for the jury to have failed to give the bank the same set-off.

■ What both appellants fail to recognize, however, is the very limited discretion a court has in molding a jury's answers to special interrogatories. As the Supreme Court has noted in *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962):

> Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's findings inconsistent results in a collision with the Seventh Amendment.

*Id.* at 364, 82 S.Ct. at 786 (citations omitted). This Circuit has interpreted *Atlantic & Gulf Stevedores* to mean that "a verdict must be molded consistently with a jury's answers to special interrogatories when there is *any view* of the case which reconciles the various answers." *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1159 (3d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989) (emphasis added). *See also Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280, 293 (3d Cir.1980) ("[s]ince there is at least one way to explain the jury's answers to the interrogatories, we are bound to affirm them"); *Barnhart v. Dollar Rent A Car Sys., Inc.*, 595 F.2d 914, 919 (3d Cir.1979) ("a court must interpret a jury's findings of fact as consistent whenever possible"); *Franklin Music Co. v. American Broadcasting Cos.*, 616 F.2d 528, 535 (3d Cir.1979) ("[t]he role of this court in reviewing seemingly inconsistent answers to special interrogatories is

---

22. The parties agreed that McAdam, his company and his company's pension and profit sharing plans were treated as one entity for purposes of determining damages. There was no objection to this procedure.

to search for a reading of the jury's responses that makes them consistent"). Thus, a trial court is "under a constitutional mandate to search for a view of the case that makes the jury's answers consistent." *United States v. 0.78 Acres of Land, More or Less*, 81 F.R.D. 618, 621 (E.D.Pa.), *aff'd without opinion*, 609 F.2d 504 (3d Cir. 1979).

Thus, our role as an appellate court is limited to determining, after plenary review, *cf. Bradford–White*, 872 F.2d at 1158, whether the district court's molding of the jury's answers is a minimally plausible "view of the case." It is not appropriate for us to speculate as to what we would have awarded if we had heard the evidence on damages, or guess what the jury was "really" trying to do in giving the answers that it did, or even judge what is the most reasonable view of those answers. The fact that appellants' may have proffered to us a view of the case—validly supported by evidence in the record—as to why the jury's answers are inconsistent, is therefore irrelevant to our initial inquiry. Rather we must decide whether the district court's interpretation of the jury's responses—an interpretation which reconciles those responses—is conceivable. We find that it is.

■ In response to Dean Witter's above-described argument, the district court denied the brokerage firm's crucial premise that the only plausible view of the case is that total damages flowing from one of the common law counts must be equivalent to McAdam's *total* damages in the case. Instead, the court found that the competing view promoted by McAdam was also plausible. According to McAdam's view, the jury, in its deliberations, could have made an analytical distinction between forged endorsement damages and nonforged endorsement damages, i.e., the losses incurred by McAdam as a result of the monies he gave directly to Murray for investment in the "special" account, including lost business profits after the fraudulent scheme was uncovered. As the district court explained: "the separation of [the common law] theories of liability from [the UCC] claims stemming from the check forging losses in both the charge and the jury interrogatories suggest the plausibility of the jury resolving damages in this fashion." App. at 147 (Letter Opinion).

Moreover, despite Dean Witter's suggestion to the contrary, the jury charge on damages does not foreclose such a competing view of the jury's interrogatory answers. For example, on the breach of fiduciary duty count, the court charged the jury in the following fashion:

> An individual or corporation that breaches its duties as a fiduciary is liable to the victim for the full amount of damages caused by the [breach]. As I've stated before, this may include monies lost, lost profits, loss of earnings or interest, and all other losses *stemming from the breach of fiduciary duty.*

App. at 97. Similarly couched charges were given for the other common law counts. Significantly, the jury was not charged that if they found Dean Witter liable on a particular common law count, then they must aggregate all of McAdam's losses to that count. In fact, none of the interrogatories asked the jury to aggregate all of McAdam's losses resulting from the defendants' actions. Rather, the jury was instructed to assess those damages "stemming" from each particular common law and UCC breach. The phrasing of the charge, therefore, leaves open the possibility that the jury dichotomized the non-forged endorsement losses, those stemming from Dean Witter's common law violations, and the forged endorsement losses, those stemming from the appellants' violations of the UCC.

Similarly, the position advanced by Midlantic that the difference between $145,140 and $466,922.71 can *only* reflect the amount Murray disbursed back to McAdam as "principal" is wrong. Midlantic's view is certainly a possible, maybe even a reasonable one; but there is another plausible version as well, the one advanced by McAdam and accepted by the district court:

> [T]he jury could have found that [Dean Witter's] failure to utilize its Account Executive Check Receipt Forms, which

facilitated Murray's ability to draw checks payable to [McAdam] on his [Dean Witter] accounts, did not *proximately* cause all of [McAdam's] damages *vis-a-vis* the forged checks, whereas Midlantic's failure to follow proper check cashing procedures was a cause of all of [McAdam's] losses in this regard.

App. at 147–48 (Letter Opinion) (emphasis added). In other words, the jury could have decided that Dean Witter's conduct in failing to utilize its check receipt forms, while egregious, was far less responsible for the forged endorsement losses than the conduct of Midlantic, which physically took the checks containing forged endorsements and handed Murray cash for them. It must be remembered that we are not the trier-of-facts, so although the appellants' may have offered evidence to the jury that McAdam received back more than the $162,000 to which he admitted, it does not follow that the jury accepted appellants' view of the case.[23] Indeed, in light of the judgment against the appellants the jury obviously did not fully accept their view.

Moreover, there is ample evidence in the record to support a combined damage award in the amount of $915,239.71. McAdam submitted evidence of 12 admittedly forged checks, payable to McAdam, totalling $466,992.71. Tr. at 814–22; Exhs. J–10–J19. McAdam also submitted evidence of funds given directly to Murray for investment in the "special" account, totalling approximately $460,000.00, and evidence of a $50,000 check that was given directly to Murray for investment in McAdam's original, nondiscretionary accounts, but which was wrongfully converted by Murray. Tr. at 770–88, 1574–76. Finally, McAdam submitted evidence of his company's lost business profits, in the amount of $3,719,157, as a result of his inability to secure bonding for his company after the "special" account was discovered to be a fraud. Tr. at 991–98, 1597–1608. Together this evidence totals $4,691,236.61, far in excess of the actual award.[24]

Therefore, we find that the interpretation of the jury's responses that the district court accepted is certainly a "view of the case which reconciles the various [special interrogatory] answers." *Bradford–White*, 872 F.2d at 1159 (emphasis added). Again, we stress that the district court's constitutional mandate was to search for a view of the case which *reconciles*, not deconstructs, the jury's interrogatory answers. The role of the district court was not to weigh the reasonableness of the appellants' views with that of McAdam's view. Rather because McAdam offered a view of the case which reconciled the answers and the appellants' views rendered the jury's answers hopelessly inconsistent,[25] the district court was *constitutional-*

---

23. Likewise, Midlantic gives us no reason why the jury had to hold that any money that Murray disbursed back to McAdam had to off-set the *forged endorsement funds* that Murray converted. It is perfectly plausible that the jury off-set any disbursements against the *nonforged endorsement losses*, i.e., the damage figure awarded under the common law counts.

24. Thus, it is conceivable that the jury might have found that Murray disbursed quite a bit of money back to McAdam, but still found a damage figure of approximately $900,000. Of course, the off-set would have been on the nonforged endorsement loss side of the jury's analytical ledger.

25. There is no way the appellants can reconcile the jury's answer to interrogatory # 27, which found Midlantic's conduct in cashing the checks containing forged endorsements proximately caused $466,992.71 in damages, with their answers to interrogatories # 4, 6, and 11, which found Dean Witter's conduct, either directly or vicariously, proximately caused damages in the amount of $448,247. On either Dean Witter's or Midlantic's view, the jury's answer to # 27 must be a mistake and must be disregarded.

Likewise, only McAdam's view, i.e., that the jury analytically distinguished the nonforged endorsement losses from the forged endorsement losses, reconciles special interrogatory # 12, which asked the jury to make a comparative negligence finding with regard to Dean Witter's liability on the negligent supervision count, with interrogatory # 35, which asked the jury whether McAdam's negligence substantially contributed to the forgeries. To the former question the jury answered that McAdam was 35% responsible for his injuries flowing from Dean Witter's breach of duty, but to the latter question, the jury found McAdam did not substantially contribute to the forgeries. We find that the way the jury handled these obvious and simple questions is a good indication that McAdam's and *the district court's interpretation is not only plausible but indeed correct.*

*ly bound* to reject the appellants' arguments. Thus, we believe that the district court committed no error in its molding of the jury verdict.

## IV.

### PUNITIVE DAMAGES

*A. The jury charge on Murray's fiduciary duty.*

■ In charging the jury on McAdam's claim against Murray for breach of a fiduciary duty, the district court instructed the jury that "a fiduciary relationship is implied from the brokerage status as a matter of law." App. at 42.[26] The district court indicated that it viewed New Jersey law as clear on the issue of whether a stockbroker is in a fiduciary relationship with his customer based on *Rothman Realty Corp. v. Bereck*, 73 N.J. 590, 599, 376 A.2d 902 (1977) (holding that a real estate broker is in a fiduciary relationship with a home seller) and *General Films, Inc. v. Sanco Gen. Mfg. Corp.*, 153 N.J.Super. 369, 372, 379 A.2d 1042 (App.Div.1977) (holding that a commodities broker who found a seller of a much needed commercial product for a buyer was in a fiduciary relationship with that buyer).

Dean Witter argues that both *Rothman* and *General Films* can be distinguished. Moreover, the brokerage firm implies that the weight of authority in other jurisdictions counsels either that a stockbroker is only a fiduciary if the customer's account is discretionary, *see Commodity Futures Trading Comm'n v. Heritage Capital Advisory Services, Ltd.*, 823 F.2d 171, 173 (7th Cir.1987), or that the existence of a fiduciary relationship is a factual determination to be made by the jury. *See Filloramo v. Johnston, Lemon & Co.*, 697 F.Supp. 517, 522 (D.D.C.1988). Dean Witter's challenge is important for two reasons. First, if there was no fiduciary duty between Murray and McAdam, then the jury could not have found, as it did in its answers to interrogatories # 3 and 4, that

Dean Witter could be vicariously liable (under any vicarious authority) for a breach of a fiduciary duty that proximately caused $448,247 worth of damage. Second, if there was no fiduciary duty, then, arguably, Dean Witter could not be directly liable for punitive damages because the district court instructed the jury that it could only find punitive damages if there was a breach of fiduciary duty or fraud. We deal first with the contention that the breach of fiduciary duty against Dean Witter cannot stand because the district court wrongly found that, as a matter of law in New Jersey, there is a fiduciary duty between a stockbroker and his or her client. Because the Supreme Court of New Jersey has not addressed this specific question, we must once again predict how that Court would decide the issue. *Pennsylvania Glass*, 652 F.2d at 1167. Thus, our scope of review is again plenary. *Oliver*, 799 F.2d at 96.

Contrary to the suggestion of Dean Witter, because this case revolves around the fraudulent scheme set up by Murray, we believe our focus must be on the relationship between McAdam and Murray *vis-a-vis* the "special" investment opportunity, not the initial, and admittedly, nondiscretionary accounts established by McAdam. With this in mind, it is self-evident that the parties envisioned the "special" account to be a discretionary one. As the court in the seminal case of *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951 (E.D.Mich.1978), *aff'd mem.*, 647 F.2d 165 (6th Cir.1981), explained, the distinction between the two types of accounts turns on whether "the customer rather than the broker determines which purchases and sales to make." *Id.* at 952. In the instant case, McAdam clearly agreed that Murray would have sole discretion over the investment decisions in the "special" account. There is no evidence that McAdam ever suggested to Murray what investment moves he should make, nor is there any suggestion that Murray purported to consult with McAdam about the transactions supposedly

---

**26.** It should be noted that the jury was instructed that only Murray was in a fiduciary relationship with McAdam, although the court could

have charged that Dean Witter was also in such a relationship. Dean Witter's App. at 42, 153 (Letter Opinion).

performed in the account. Indeed, it is conceded by Dean Witter that McAdam had no idea what securities were in the account, nor did he receive a monthly statement detailing the investments or the transactions in the account. *See* Dean Witter's Brief at 5–6.

As Dean Witter establishes in its own brief, the clear weight of authority is that, at least when the client maintains a discretionary account with a stockbroker, the broker is in a fiduciary relationship with that client. *See Commodity Futures,* 823 F.2d at 173 (applying Illinois law); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 803 F.2d 454, 460 (9th Cir.1986) (applying California law); *Thropp v. Bache Halsey Stuart Shields, Inc.,* 650 F.2d 817, 819 (6th Cir.1981) (applying Ohio law); *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1026 (6th Cir.1979) (applying federal law); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 45 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (applying federal law); *Refco, Inc. v. Troika Investment Ltd.,* 702 F.Supp. 684, 686 (N.D.Ill.1988); *Ellis v. Merrill Lynch & Co.,* 664 F.Supp. 979, 981 (E.D.Pa.1987) (applying federal law); *Alfaro v. E.F. Hutton & Co.,* 606 F.Supp. 1100, 1120 (E.D.Pa. 1985) (applying Pennsylvania law); *Leib,* 461 F.Supp. at 952; *Merrill Lynch, Pierce, Fenner & Smith v. Perelle,* 356 Pa.Super. 165, 182–84, 514 A.2d 552 (1986); 12 Am. Jur.2d *Brokers* § 113 (1964) ("A stockbroker, like any other broker, is under a duty to act in good faith toward his customer, and it is held that the relation between a stockbroker and his customer is a fiduciary one, especially in cases where the customer deposits money with the broker for the purchase of securities....") (footnotes omitted).

We are confident that the Supreme Court of New Jersey would follow this impressive legal authority. And, we are buttressed in

that conclusion by the broad principle found in *Rothman* and *General Films*—cases which have yet to be adequately distinguished by Dean Witter—and utilized by the district court in its jury charge, *e.g., General Films,* 153 N.J.Super. at 372, 379 A.2d 1042 ("a fiduciary relationship is implied from the brokerage status as a matter of law"); *cf. Francis v. United Jersey Bank,* 87 N.J. 15, 37–38, 432 A.2d 814 (1981) (reinsurance brokerage firm is in a fiduciary relationship with its clients), and hints in lower court decisions that such a principle is applicable to the stockbroker situation. *See White v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 90 N.J.Super. 565, 570, 218 A.2d 655 (Law Div.1966) (while not squarely addressing the issue of a stockbroker's status, the court implied that if a stockbroker's conduct violates a rule of the stock exchange, then an injured client has a cause of action for breach of a fiduciary duty). For the foregoing reasons we find that the district court committed no error in instructing the jury that a fiduciary relationship was implied from the status of Murray as a stockbroker in a discretionary account.[27]

B. *The jury charge on punitive damages.*

The district court's charge to the jury on the issue of punitive damages was, in relevant part, the following:

Finally, if you find that defendants are liable to plaintiffs for fraud or breach of fiduciary duty, you must then consider whether they are entitled to punitive damages. You may award such damages if you determine that the defendants' acts as to these plaintiffs were actuated by:

One, actual malice, which is nothing more or less than intentional wrongdoing, an evil-minded act; or

---

**27.** *Erlich v. First Nat'l Bank of Princeton,* 208 N.J.Super. 264, 505 A.2d 220 (Law Div.1984), is not to the contrary. The type of account involved in *Erlich* was a nondiscretionary one, although the account manager was required to give investment advice to the customer. *Id.* at 286, 505 A.2d 220. Interestingly, we note that

the *Erlich* court did hold the account manager to a heightened standard of care very similar to the fiduciary duties the district court instructed the jury that Murray must satisfy. *Compare id.* at 292–98, 505 A.2d 220 *with* App. at 42 (jury charge).

Two, an act accompanied by a wanton and willful disregard of the rights of another. In other words, a deliberate act with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of his act. Negligence, even gross negligence in and of itself on the part of the defendants, will not suffice for a punitive damage award.

App. at 100–01. We interpret this charge as allowing the jury to consider awarding punitive damages against a defendant *only if* that defendant was found to be liable to McAdam on either a fraud or breach of fiduciary duty count.

Both appellants challenge the award of punitive damages against them based on this charge. Dean Witter argues that the charge itself was deficient. The brokerage firm contends that since the jury found for it on the fraud count and there was no direct breach of fiduciary duty claim raised against Dean Witter, *see* App. at 55–56 (jury charge), the punitive damage award against the brokerage firm could only be based on its vicarious liability for Murray's breach of *his* fiduciary duty. *See* App. at 153 (Letter Opinion).

■ Yet, the general rule in New Jersey is that punitive damages may not be assessed vicariously against a principal for the acts of its agent. *Enright v. Lubow*, 202 N.J.Super. 58, 82, 493 A.2d 1288 (App. Div.1985), *cert. denied*, 104 N.J. 376, 517 A.2d 386 (1986). There are only limited exceptions to this rule.[28] Because the jury in this case was not instructed as to the limited circumstance under which they could properly award punitive damages vicariously against Dean Witter, the charge expanded the exposure of Dean Witter beyond what New Jersey law allows. Thus, Dean Witter argues that the charge was misleading and failed to fairly and ade-

quately submit the issue of punitive damages, *based on a theory of vicarious liability*, to the jury. *See, e.g., Bennis v. Gable*, 823 F.2d 723, 727 (3d Cir.1987).

Midlantic has a slightly different argument. The bank does not contest the adequacy of the charge itself, but instead contends that causes of action for fraud and breach of fiduciary duty were only brought against Dean Witter. The only cause of action on which Midlantic was held liable was for conversion under § 3–419(1)(c) of the UCC. Since the jury was instructed to consider punitive damages against a defendant only if the jury found that that defendant committed fraud or breached its fiduciary duty, the jury went beyond its instructions, Midlantic submits, when it assessed punitive damages against Midlantic. Moreover, the bank argues that since the cause of action on which it was held liable is a *contract* claim, punitive damages would have been inappropriate under any charge. *See, e.g., Sandler v. Lawn–A–Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 449, 358 A.2d 805 (App.Div.), *cert. denied*, 71 N.J. 503, 366 A.2d 658 (1976).

■ However, from the record before us, it is clear that neither Dean Witter nor Midlantic raised these objections in the district court. Rather all parties, including the appellants, proceeded at trial on the assumption that punitive damages would be assessed against the defendants, if at all, based on the character of their own conduct in this case.

For example, Dean Witter's objection at trial to the issue of punitive damages being submitted to the jury was premised not on the insufficiency of evidence to satisfy the narrow *Enright* exceptions, but to the insufficiency of the evidence to find that Dean Witter's *own conduct* had satisfied the malicious or wantonly reckless standard. *See* Tr. at 2903–94. In addition, the

---

**28.** Those exceptions are the following:

 (a) the principal or a managerial agent authorized the doing and the manner of the act, or
 (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

 (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
 (d) the principal or a managerial agent of the principal ratified or approved the act.

*Enright*, 202 N.J.Super. at 82, 493 A.2d 1288 (quoting from the Restatement (Second) of Torts, § 909 (1977)).

charge on punitive damages submitted by Dean Witter and rejected by the court—as a result of which Dean Witter preserved its objection on appeal as to any discrepancy between it and the actual charge—did not mention the narrow *Enright* exceptions. Finally, Dean Witter failed to raise its vicarious liability objection in its Motion for a New Trial and Judgment Notwithstanding the Verdict.

Likewise, Midlantic raised no objection at trial to the jury considering whether punitive damages were available based on the bank's conduct in violating the UCC. On the contrary, Midlantic assented to special interrogatory # 39 which specifically asked the jury: "Is plaintiff Thomas McAdam entitled to punitive damages against Midlantic ...?" Midlantic did not express any reservations in the trial record that this interrogatory might conflict with the jury instruction. Moreover, Midlantic's *own* requested charge on punitive damages would have conceded that the UCC violation could support such an award by instructing the jury that "an award of punitive damages is an issue reached only if you first determine that plaintiff has proved his claim against defendant and has suffered a legal injury." App. at 129. Midlantic also did not raise the objection that the jury exceeded its instructions in awarding punitive damages against the bank in its Motion for a New Trial or Judgment Notwithstanding the Verdict.

Thus, it is clear to us that both appellants proceeded at trial on the assumption that punitive damages would be assessed against them, if at all, based on their own conduct. Their present arguments on appeal seem to have been developed after the district court had already rejected their other post-trial challenges to the award of punitive damages. Having proceeded on this assumption and, therefore, having failed to specifically and clearly object to either the charge or the entry of a judgment awarding punitive damages based on this charge, we will decline to consider both Dean Witter's newly developed argument concerning the jury charge deficiency, *see* Fed.R.Civ.P. 51 [29]; *Abraham v. Pekarski,* 728 F.2d 167, 172 (3d Cir.), cert. denied, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); *Tose v. First Pa. Bank, N.A.,* 648 F.2d 879, 900 (3d Cir.), cert. denied, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Bogacki v. American Machine & Foundry Co.,* 417 F.2d 400, 407 (3rd Cir. 1969), and Midlantic's newly developed legal theory of error. *See Page v. Schweiker,* 786 F.2d 150, 153 (3d Cir.1986); *Patterson v. Cuyler,* 729 F.2d 925, 929 (3d Cir. 1984); [30] *Toyota Indus. Trucks U.S.A. v. Citizens Nat'l Bank,* 611 F.2d 465, 470 (3d Cir.1979); *Newark Morning Ledger Co. v. United States,* 539 F.2d 929, 932–33 (3d Cir.1976).

 Dean Witter argues that we should disregard Rule 51 on the basis of the plain error doctrine. *See Bereda v. Pickering*

---

**29.** Rule 51 reads in relevant part:

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection....

Fed.R.Civ.P. 51. "The purpose of Rule 51 of the Federal Rules of Civil Procedure ... is to afford the trial judge an opportunity to correct the error in his charge before the jury retires to consider its verdict[,]" *Porter v. American Export Lines, Inc.,* 387 F.2d 409, 412 (3d Cir.1968), and to lessen the burden on appellate courts by diminishing the number of rulings at the trial which they may be called upon to review. 9 C. Wright, & A. Miller Federal Practice and Procedure § 2551, at 623. By establishing such a rule and following its dictates the necessity of a retrial is avoided when, by design or through

sheer neglect, the losing party fails to make objection at the proper time. *Id.*

**30.** In *Patterson,* we described the rationale for our well-established rule that all claims of error must first be raised in the district court this way:

> This prudential policy seeks to insure that litigants have every opportunity to present their evidence in the forum designed to resolve factual disputes. By requiring parties to present all their legal issues to the district court as well, we preserve the hierarchical nature of the federal courts and encourage ultimate settlements before appeal. It also prevents surprise on appeal and gives the appellate court the benefit of the legal analysis of the trial court.

*Patterson,* 729 F.2d at 929.

*Creek Indus. Park, Inc.*, 865 F.2d 49, 53 (3d Cir.1989); *Bennis,* 823 F.2d at 723. In *Bennis,* we explained that:

> [A] party who does not clearly and specifically object to a charge he believes to be erroneous waives the issue on appeal, unless the error was so "fundamental and highly prejudicial" as to constitute plain error, or unless the instruction was such "that the jury [was] without adequate guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice."

*Id.* at 727 (quoting *Bowley v. Stotler & Co.,* 751 F.2d 641, 647 (3d Cir.1985)) (citations omitted).[31] Similarly, Midlantic's failure to raise its legal issue at trial is not a jurisdictional bar, but we will consider such arguments only if there are compelling circumstances requiring it. *E.g., Patterson,* 729 F.2d at 929.

Yet, after carefully reviewing the record, we find neither compelling circumstances in this case requiring us to deviate nor a miscarriage of justice resulting from our strict adherence to this Court's prudential policy of declining to consider newly developed theories of error on appeal. Whether Dean Witter can be held vicariously liable for punitive damages in light of the district court's failure to ask the jury whether Dean Witter was "reckless in employing or retaining" Murray, *see supra* note 29, is irrelevant because the punitive damage award can be based on Dean Witter's direct liability to McAdam.[32] The punitive damage award implicitly required a finding that the underlying conduct was not merely negligent, it was reckless. As such, punitive damages are permissible if a properly instructed jury finds them appropriate.

Under New Jersey law, tortious conduct can serve as the underlying cause of action on which an award of punitive damages can be predicated. *See, e.g., Zippertubing, Co. v. Teleflex, Inc.,* 757 F.2d

1401, 1413 (3d Cir.1985); *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 72, 417 A.2d 505 (1980); *Di Giovanni v. Pessel,* 55 N.J. 188, 190–91, 260 A.2d 510 (1970); *Dreimuller v. Rogow,* 93 N.J.L. 1, 107 A. 144, 145 (N.J.Sup.Ct.1919); J. Ghairdi & J. Kircher, Punitive Damages: Law and Practice § 5.17 (1987). *See generally* Restatement (Second) of Torts § 908, comment b (1979). Such underlying conduct need not constitute an intentional tort. *See, e.g., Fischer v. Johns–Manville Corp.,* 103 N.J. 643, 652, 512 A.2d 466 (1986) (strict liability). *See generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton On the Law of Torts 11 (5th ed. 1984) ("it is not so much the particular tort committed as the defendant's motives and conduct in committing it which will be important as the basis of the award"). So besides fraud and a breach of fiduciary duty, punitive damages could have been properly assessed against Dean Witter if the brokerage firm had breached its duty to supervise Murray and such breach had been malicious or wantonly reckless. *See Oliver,* 799 F.2d at 97 n. 1 ("[i]t is clear that the New Jersey Supreme Court would not allow an award of punitive damages in a negligence action *absent* compensatory damages") (emphasis added); *Gold v. Johns–Manville Sales Corp.,* 553 F.Supp. 482, 485 (D.N.J.1982) (applying New Jersey law) ("[p]unitive damages are traditionally allowed in negligence suits, if the facts warrant their imposition"); *Kenney v. Scientific, Inc.,* 204 N.J.Super. 228, 253–54, 497 A.2d 1310 (Law Div.1985). *See generally Fischer,* 103 N.J. at 658, 512 A.2d 466 ("plaintiffs may pursue products liability claims not only under principles of strict liability but also under theories of negligence or intentional tort. No one would argue that in either of the latter instances a plaintiff would be barred from seeking punitive damages."); J. Ghiardi & J. Kirch-

---

**31.** However, we should note that this Court has repeatedly stated that our discretionary power to review errors in jury instructions which were not objected to at trial should be exercised sparingly. *See, e.g., Trent v. Atlantic City Elec. Co.,* 334 F.2d 847, 859 (3d Cir.1964). *See also* 9 C. Wright, & A. Miller, Federal Practice and Proce-

dure *supra,* § 2558, at 675. Otherwise, Rule 51, and the beneficial policy goals it serves, will be emasculated.

**32.** In interrogatory # 7, the jury found Dean Witter liable, directly, for negligence.

er, *supra*, at § 5.18–5.19.[33] Although the jury instruction appears to have allowed a punitive recovery only if there was a breach of fiduciary duty, such a duty is not required to justify a punitive award. Thus, the error in the jury instruction did not seriously prejudice Dean Witter.[34]

■ A similar argument holds true for Midlantic. While as a matter of law, the bank may not have owed a fiduciary duty to McAdam, a violation of § 3–419(1)(c) provides a sufficient predicate on which to assess punitive damages against Midlantic. For at early common law, the action of trover was a species of action on the case and, as such, was a tort. *See generally* 89 C.J.S. *Trover & Conversion* § 66 (1955). "The gist of an action in trover is conversion." *Mueller v. Technical Devices Corp.,* 8 N.J. 201, 207, 84 A.2d 620 (1951). *See also* 89 C.J.S. *Trover & Conversion* § 65 (1955). Conversion is essentially the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property. *Life Ins. Co. of Va. v. Snyder,* 141 N.J.Super. 539, 545, 358 A.2d 859 (Passaic County Ct.1976); *Mueller,* 8 N.J. at 207, 84 A.2d 620; *McGlynn v.*

*Schultz,* 90 N.J.Super. 505, 526, 218 A.2d 408 (Ch.Div.1966) (citing 89 C.J.S. *Trover and Conversion* § 1 (1955)), *aff'd,* 95 N.J. Super. 412, 231 A.2d 386 (App.Div.), *cert. denied,* 50 N.J. 409, 235 A.2d 901 (1967).

Section 3–419 simply designates certain actions in the commercial sphere as constituting acts of conversion of a negotiable instrument for purposes of the UCC. *See, e.g.,* 6 R. Anderson, *supra,* § 3–419:3, at 420. Thus, the Code simply codifies certain acts which were already tortious at common law. N.J.Stat.Ann. § 12A:3–419, Uniform Commercial Code comment 2 (West 1962). *See also Equitable Life Assurance Soc'y of Am. v. Okey,* 812 F.2d 906, 908–09 (4th Cir.1987). *See generally Knesz,* 97 N.J. at 13 n. 3, 477 A.2d 806. When a party brings an action under § 3–419, the action is not on the instrument, but is in tort for its conversion. *Id.*[35] *See also Okey,* 812 F.2d at 908–09; 6 Anderson, *supra,* § 3–419:33, at 434. *Cf. Buckley v. Trenton Sav. Fund Soc'y,* 111 N.J. 355, 361–62, 544 A.2d 857 (1988) (an action for wrongful dishonor under the UCC is a hybrid action which sounds in both tort and contract)[36]; *Tormo v. Yormark,* 398

---

**33.** It is clear, of course, that a mere breach of duty, i.e., negligent conduct, on the part of a tortfeasor can not support an award of punitive damages in any jurisdiction; however, this does not mean, as appellants appear to argue, that only an intentional tort can support such an award. Rather a breach of duty can support a punitive award if such breach rises to the sufficiently egregious level, i.e., is actuated by malice or wanton recklessness. *See, e.g., Berg v. Reaction Motors Div.,* 37 N.J. 396, 413, 181 A.2d 487 (1962) (punitive damages "are not to be applied in the *ordinary unaggravated* tort case whether it be grounded on *strict liability* or *fault* ") (emphasis added). In this connection, it should be noted that in McAdam's complaint, he specifically alleges: "Defendant [Dean Witter] negligently or intentionally permitted defendant, Murray and/or other agents, servants, employees and representatives of [Dean Witter] to remove funds from plaintiffs' accounts while acting under color of the authority of defendant, [Dean Witter], and/or negligently, carelessly, or recklessly failed to supervise defendant, Murray, and other[s]...." App. at 183. McAdam sought punitive damages as relief under this count. *Id.*

**34.** We note that except for the *Enright* principles and the narrowness of the underlying causes of action, the charge as given was suffi-

cient under New Jersey law on all other points, including the standard for awarding punitive damages. It should also be pointed out that McAdam properly objected to the actual charge on the basis that it incorrectly narrowed the legally possible causes of action which could support a punitive damage award.

**35.** UCC comment 3 states that subsection (c) of § 3–419(1) is new, but that the Code "adopts the prevailing view of decisions holding that payment on a forged indorsement is not an acceptance, but that even though made in good faith it is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion." N.J.Stat.Ann. § 12A:3–419, Uniform Commercial Code comment 3 (West 1962).

**36.** In holding that a cause of action for wrongful dishonor under § 4–402 sounds in both contract and tort, the New Jersey Supreme Court held that: "To the extent the cause of action arises out of the contractual arrangement between the bank and its customer, it sounds in contract, but to the extent it arises from the status of the parties and their relationship to each other apart from contract, the cause may more appropriately be characterized as a tort

F.Supp. 1159, 1180 (D.N.J.1975) (holding that a bank which was liable under § 3–419 could properly seek contribution under New Jersey's Joint Tortfeasor Contribution Law from concurrent wrongdoer).[37]

Consistent with the view of § 3–419 as sounding in tort, courts have held that a conversion action under the Code could support an award of punitive damages if the bank's conduct is sufficiently aggravated to meet that jurisdiction's particular punitive standard. *See D & G Equip. Co. v. First Nat'l Bank of Greencastle, Pa.,* 764 F.2d 950, 957 n. 6 (3d Cir.1985); *Sherrill White Const., Inc. v. South Carolina Nat'l Bank,* 713 F.2d 1047, 1051–52 (4th Cir.1983); *Louis v. Citizen's & S. Bank of Dublin,* 189 Ga.App. 164, 375 S.E.2d 82, 85 (1988); *Mohr v. State Bank of Stanley,* 241 Kan. 42, 734 P.2d 1071 (1987) ("[t]he usual rules governing the allowance of punitive damages are applicable in conversion cases arising under the U.C.C."); *Beir v. Manufacturer's Hanover Trust Co.,* 110 A.D.2d 529, 488 N.Y.S.2d 1, 1 (1985). *Cf. Buckley,* 111 N.J. at 370, 544 A.2d 857 (punitive damages can be predicated on a bank's wrongful dishonor in violation of § 4–402, if the bank's supervisors' conduct is wantonly reckless or malicious).[38] For example, in *Greencastle,* this Court held

that the mere act of conversion under § 3–419 does not suffice to entitle the plaintiff to punitive damages. *Greencastle,* 764 F.2d at 957 n. 6.[39] However, we explained that punitive damages could be appropriately predicated on a conversion action under that section of the Code if the bank's conduct had "stemmed from malice, conscious indifference to the rights of others, or reckless disregard of such rights." *Id.*

Therefore, we find that because Midlantic's tortious conversion under § 3–419, and Dean Witter's breach of its duty to supervise Murray, could properly serve as the basis for the imposition of punitive damages if accompanied by sufficiently aggravated conduct *and* because the actual charge correctly instructed the jury on what constitutes such aggravation, the error in the jury charge did not work to seriously prejudice the appellants.[40] By too narrowly defining the underlying causes of action which could support such an award, the charge could have only been seriously prejudicial to McAdam, not the appellants. The correct charge would have only differed from the actual charge in that it would have instructed the jury to consider whether McAdam was entitled to punitive damages if the jury first found that

---

action." *Buckley,* 111 N.J. at 362, 544 A.2d 857. Unlike the facts of our case, in *Buckley* the plaintiff was suing the bank in which he kept his checking account. Nevertheless, the Court still found such an action a hybrid one. McAdam was not in a contractual relationship with Midlantic *vis-a-vis* the checks containing forged endorsements. Therefore, the conversion action that McAdam brought arises from the status of McAdam and Midlantic apart from any contract. Midlantic took control of the checks, rightfully belonging to McAdam, and paid cash on them to Murray without McAdam's authorization and, thus, inconsistent with his rights as owner.

**37.** Contrary to the suggestion of Midlantic, the view of White and Summers is not to the contrary. While Midlantic is correct that these two scholars note in their introductory remarks to Article 3 that they are going to "consider the contractual liability of parties to a negotiable instrument" in chapter 13 of their book, they *expressly* note in parenthesis that they "will postpone [their] discussion of *noncontractual liabilities* of parties to a check (warranty, tort, etc.) until later chapters on lost and stolen instru-

ments." J. White & R. Summers, Uniform Commercial Code 487 (2d ed. 1980) (emphasis added). This later discussion of noncontractual liabilities occurs, in substantial part, in chapter 15 where § 3–419 liability is discussed. *Id.* at 578.

**38.** Although under the facts of the case before it the bank's conduct did not rise to the level sufficient to assess punitive damages, the *Buckley* court found the authorization under the Code to award such damages in an appropriate case from the Code's suggestion that it does not implicitly displace the principles of law and equity. *See Buckley,* 111 N.J. at 370, 544 A.2d 857. *See also* N.J.Stat.Ann. § 12A:1–103, 12A:1–106(1) (West 1962).

**39.** In *Greencastle* we were explicating Pennsylvania's version of § 3–419 which is similar to New Jersey's version in all relevant respects.

**40.** We note that neither appellant argues on appeal, although they did argue at trial, that the evidence was insufficient to support a finding of punitive damages based on their *own conduct.*

defendants were liable not just for fraud or breach of fiduciary duty, but also for either negligent supervision or for violating the UCC. But, since the jury disregarded the narrowness of the instruction anyway, and assessed the appellants' own conduct under the proper punitive standard, finding them both to have acted either wantonly reckless or maliciously, the appellants have no real complaint that justice will be ill-served by us failing to consider their newly conceived challenges to the charge.[41] Thus, we will affirm the award of punitive damages against the appellants.[42]

## V.

## PREJUDGMENT INTEREST

Both appellants appeal the district court's award of prejudgment interest to McAdam. We review a decision to grant prejudgment interest for an abuse of discretion. *Feather v. United Mine Workers of Am.*, 711 F.2d 530, 540 (3d Cir.1983). Because we find no abuse here, we will affirm the award.

■■■■■■■ As an initial matter, we note that New Jersey law controls the question of whether prejudgment interest is available. *Cf. Poleto v. Consol. Rail Corp.*, 826 F.2d 1270, 1274 n. 6 (3d Cir.1987). The general rule in tort actions in New Jersey is that prejudgment interest shall be awarded in all but the exceptional cases.

*E.g., Ruff v. Weintraub*, 105 N.J. 233, 245, 519 A.2d 1384 (1987); N.J.Sup.Ct.R. 4:42–11(b); S. Pressler, Rules Governing the Courts of the State of New Jersey 931 (1988) (the authority to suspend the running of prejudgment interest should "be most cautiously exercised, and always with consideration of the underlying purpose and philosophy of the rule—namely that prejudgment interest is not a penalty but is rather a payment for the use of money"). In contrast, the court in contract actions must consider whether the equities involved in the case support an award of prejudgment interest. *E.g., Meier v. New Jersey Life Ins. Co.*, 101 N.J. 597, 622, 503 A.2d 862 (1986). Since McAdam recovered against the appellants on both tort and contract claims[43] we must examine the district court's application of both rules. With regard to McAdam's claims which sound in tort, the district court held that the case was not exceptional. App. at 160 (Letter Opinion). Rather, the court found this case involved the typical tort situation in which prejudgment interest is appropriate, i.e., the defendant wrongfully disputes the plaintiff's entitlement to a sum of money while retaining use of that money for the defendant's own benefit until a judgment is entered and paid. Pressler, *supra*, at 931; *Zippertubing*, 757 F.2d at 1415 (applying New Jersey law). Since McAdam established his rightful entitlement to a

---

**41.** Under these circumstances if we were now to allow the appellants to exhaustively analyze the record, after the trial, in order to come up with additional theories of error to proffer in front of an appellate court, it "would mean that verdicts in many cases in which counsel had failed to ask for instructions in accordance with the facts and the law would require reversal." *Bogacki,* 417 F.2d at 407.

**42.** We find the appellants' other objections to the punitive damage charge without merit. We find nothing in *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224 (1984), or *Morris v. MacNab,* 25 N.J. 271, 135 A.2d 657 (1957), which required the district court to supplement its charge to the jury. Rather the district court's charge adequately tracked New Jersey law. *See, e.g., Leimgruber v. Claridge Assoc., Ltd.,* 73 N.J. 450, 454, 375 A.2d 652 (1977). The charge correctly stated the standard for awarding punitive damages.

*See, e.g., Fischer,* 103 N.J. at 655, 512 A.2d 466; *Nappe,* 97 N.J. at 49, 477 A.2d 1224. *See generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *supra,* at 212, 213 (the terms willful, wanton and reckless "apply to conduct which is still, at essence, negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended. Thus, it is held to justify an award of punitive damages....").

**43.** Judgment was entered against Midlantic for statutory conversion under the UCC. As Professor Anderson explains:

> The Code makes no provision relating to the recoverability of prejudgment interest in an action based on UCC § 3–419. As such action is tortious in character, the recoverability of prejudgment interest will be governed by the pre-Code law relating to the recovering of such interest in tort actions.

6 Anderson, *supra,* § 3–419:33, at 434.

sum of money in the possession of the appellants, they also owe McAdam for the prejudgment use of that money. Neither Dean Witter nor Midlantic provide us with any reason why we should question the district court's characterization.

With regard to McAdam's claim which sounds in contract, the appellants argue that prejudgment interest should be barred because McAdam concealed his relationship with Murray and lied to the court about the extent of his damages. Such equitable concerns they contend, militate against the award of prejudgment interest. In rejecting the appellants' arguments, the district court stressed that in light of the jury's determination both that McAdam was entitled to over $2 million in damages and that punitive damages were appropriate as punishment for the appellants' conduct, the equities in the case lie with McAdam.

We believe the district court's conclusion is both reasonable and properly within the bounds of the court's broad discretion. We have already considered McAdam's secretiveness concerning the "special" account, but have found such conduct consistent with Murray's instructions as to the non-public, preferred customer nature of the investment opportunity, not with wrongdoing on the part of McAdam. Indeed, McAdam believed all along that he was dealing with Dean Witter through its agent Murray. Furthermore, credibility determinations are not for this Court to make. The district court was in a much better position, after hearing the evidence and observing the demeanor of the witnesses, to judge whether a person was intentionally misrepresenting material facts to the court.[44] Accordingly, because we find no errant application of New Jersey's rules on prejudgment interest to the facts of this case, we will affirm the district court's award of prejudgment interest to McAdam.

## VI.

## ATTORNEYS' FEES

The final issue before us presents another difficult prediction of New Jersey law. In this litigation Morgan, the drawee bank, cross-claimed against Midlantic, the initial collecting bank, for breach of Midlantic's warranty of good title to the forged checks it presented for payment, in violation of § 4–207 of the UCC.[45] There is no question raised as to Midlantic's liability to Morgan under the UCC scheme. Instead, Midlantic objects to the district court's award of attorneys' fees to Morgan as part of the damages properly attributable to Midlantic's breach of its warranty.

The statute itself does not specifically include attorneys' fees in the recoverable damages for breach of warranty. Section 4–207(3) reads in relevant part:

> Damages for breach of such warranties [under section (1)] ... shall not exceed the consideration received by the customer or collecting bank responsible plus finance charges and *expenses* related to the item, if any.

N.J.Stat.Ann. § 12A:4–207(3) (West 1962) (emphasis added). In deciding to award attorneys' fees to Morgan, the district court relied on the UCC comments to this section. Specifically, comment 5 interprets "expenses" to include "ordinary collecting expenses and in appropriate cases could also include such expenses as attorneys fees." N.J.Stat.Ann. § 12A:4–207, Uniform Commercial Code comment 5 (West 1962). Midlantic argues, on the contrary, that UCC comment 5 is not a good indication of the intent of New Jersey's legislature, especially in light of the fact that the

---

44. To the extent such equitable considerations are also applicable in determining whether prejudgment interest is available in a tort action, *see Pavoll v. Island Petroleum*, 204 N.J.Super. 99, 103, 497 A.2d 919 (Law Div.1985), we also find that they are insufficient to transform this case into an exceptional one.

45. Section 4–207(1) reads in relevant part:

> Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that
> (a) he has good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title....

N.J.Stat.Ann. § 12A:4–207(1) (West 1962).

New Jersey study comments to § 4–207 do not reiterate the interpretation of UCC comment 5, but instead remain silent as to the proper meaning of "expenses".

Because neither the New Jersey Supreme Court, nor any lower court, has dealt with this issue,[46] we must once again predict how the New Jersey Supreme Court would decide the question.[47] *Pennsylvania Glass*, 652 F.2d at 1167. Accordingly, our scope of review is plenary. *Oliver*, 799 F.2d at 96. While we find this to be a very difficult issue to resolve, we believe that the New Jersey Supreme Court would not allow attorneys' fees in this situation.

We begin our analysis by observing that the New Jersey courts have had an unhappy history with the practice of awarding attorneys' fees. Up until 1948 when the equity and legal systems were merged, the New Jersey chancery system was rife with abuses in which favored members of the bar would be routinely granted excessive fees. *Satellite Gateway Comm'n v. Musi Dining Car Co.*, 110 N.J. 280, 285, 540 A.2d 1267 (1988). Because of such historical abuses, the New Jersey courts have since then strictly adhered to the "American rule" in regards to attorneys' fees. *E.g., Van Horn v. City of Trenton*, 80 N.J. 528, 538, 404 A.2d 615 (1979) ("the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser") (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975)). This policy has been codified in various court rules, all of which have "embraced the view that sound judicial administration will best be advanced by having each litigant bear his own counsel fee." *Gerhardt v. Continental Ins. Cos.*, 48 N.J. 291, 301, 225 A.2d 328 (1966). The present rule on attorneys' fees provides a small number of very specific exceptions to the more general principle:

> No fee for legal services shall be allowed in the taxed costs or otherwise, except
>
> (1) *In a family action....*
> (2) *Out of a fund in court....*
> (3) *In a probate action....*
> (4) *In an action for the foreclosure of a mortgage....*
> (5) *In an action to foreclose a tax certificate or certificates....*
> (6) *In an action upon a liability or indemnity policy of insurance,* in favor of a successful claimant.
> (7) *As expressly provided by these rules with respect to any action,* whether or not there is a fund in court.
> (8) *In all cases where counsel fees are permitted by statute.*

N.J.Sup.Ct.R. 4:42–9 (emphasis in the original). However, the New Jersey Supreme Court has stressed that "the narrowness of [the exceptions] ... has always [been] rigorously enforced, lest they grow to consume the general rule itself." *Van Horn*, 80 N.J. at 538, 404 A.2d 615.

Consistent with this policy, attorneys' fees are not recoverable absent *express* authorization by statute, court rule or contract. *E.g., State of New Jersey, D.E.P. v. Ventron Corp.*, 94 N.J. 473, 505, 468 A.2d 150 (1983). New Jersey courts have repeatedly refused to award attorneys' fees because of the lack of a specific rule or statute so providing. *See* Pressler, *supra*, at 922. *Accord Christian Science Bd. of Directors v. Evans*, 191 N.J.Super. 411, 467 A.2d 268 (Ch.Div.1983), *aff'd in part and rev'd in part on other grounds*, 199 N.J. Super. 160, 488 A.2d 1054 (App.Div.1985), *aff'd*, 105 N.J. 297, 520 A.2d 1347 (1987); *Endress v. Brookdale Community College*, 144 N.J.Super. 109, 364 A.2d 1080 (App.Div.1976); *Weiman v. Ippolito*, 129 N.J.Super. 578, 324 A.2d 582 (App.Div.

---

**46.** Courts applying New Jersey law have discussed § 4–207 generally, but none have specifically addressed the issue of the availability of attorneys' fees under this section. *See, e.g., Girard Bank*, 474 F.Supp. at 1237; *Clarkson v. Selected Risks Ins. Co.*, 170 N.J.Super. 373, 406 A.2d 494 (Law Div.1979).

**47.** State rules concerning the award or denial of attorneys' fees are to be applied in cases where federal jurisdiction is based on diversity or if the court is exercising pendent jurisdiction, provided such rules do not run counter to federal statutes or policy considerations. *Cf. Montgomery Ward & Co. v. Pacific Indem. Co.*, 557 F.2d 51, 56 (3d Cir.1977).

1974), *opinion amended on other grounds,* 130 N.J.Super. 207, 326 A.2d 70 (App.Div.1974); *Atlas v. Silvan,* 128 N.J. Super. 247, 319 A.2d 758 (App.Div.1974). And when courts have allowed the recovery of attorneys' fees in statutory indemnity actions, they have based that allowance on specific language in the statute providing for such. *See Springfield Imported Motors, Ltd. v. Jaguar Rover Triumph, Inc.,* 187 N.J.Super. 124, 453 A.2d 919 (Law Div. 1982). *Accord Valerius v. City of Newark,* 84 N.J. 591, 423 A.2d 988 (1980); *Suruda v. Jersey City Bd. of Educ.,* 167 N.J.Super. 331, 400 A.2d 860 (Law Div. 1979). *See generally* Pressler, *supra,* at 921–22.[48]

Given the general reluctance of the New Jersey courts to award attorneys' fees without express statutory authorization, we can not find the vague reference in § 4–207(3) to 'expenses' sufficient basis on which to predicate such an award. We are supported in this conclusion by courts in other jurisdictions who have similarly held that § 4–207(3) was simply not explicit enough to warrant the disregard of their own jurisdiction's general prohibition against awarding attorneys' fees. *See Perkins State Bank v. Connolly,* 632 F.2d 1306, 1315–16 (5th Cir.1980) (applying Florida law); *Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 491 F.2d 192, 198 n. 9 (8th Cir.1974) (applying Missouri law); *Riedel v. First Nat'l Bank,* 287 Or. 285, 290–91, 598 P.2d 302 (1979) (applying Oregon law).

Moreover, we do not find that UCC comment 5 is a sufficient guide to the legislature's intent to alleviate the vagueness of the statute. Clearly, the New Jersey Commissioners who annotated the Code were aware of the UCC comments. *Cf.* Abrams, *Introduction and New Jersey History of the Uniform Commercial Code,* 17 Rutgers L.Rev. 1, 3 (1962) (the author, who was the chairman of the New Jersey Committee to Study and Report on the Uniform Commercial Code which annotated the statute, explains that the Committee had the constant advice and assistance of the National Conference of Commissioners). Yet, they decided not to follow the official comments in making explicit that "expenses" should include attorneys' fees. Such a conspicuous absence naturally leads to the reasonable inference that the New Jersey Commissioners were simply reflecting New Jersey's judicial aversion to such awards.[49] Thus, it would be unwarranted for us to blindly attribute the explicitness of the UCC comment to the New Jersey legislators when the New Jersey committee appointed to study the matter itself refused to follow that explicitness when it explained the statute to the New Jersey bar. When confronted with a similar problem of statutory construction, the Supreme Court of Oregon nicely summed up our own view here when it wrote:

Given the historical antipathy of this court to awarding attorney fees in the absence of express authority and the leg-

**48.** Since we believe that § 4–207 must be viewed as setting up a *statutory indemnity scheme,* Morgan's argument that the New Jersey's courts have given *indemnity contracts,* negotiated and voluntarily agreed to by the parties, a more liberal treatment is, therefore, not apt. *See Bethlehem Steel Corp. v. K.L.O. Welding Erectors, Inc.,* 132 N.J.Super. 496, 334 A.2d 346 (App.Div.1975); *Fornarotto v. Clara Maass Memorial Hospital,* 118 N.J.Super. 316, 287 A.2d 459 (App.Div.1972); *Johnson v. Johnson,* 92 N.J. Super. 457, 224 A.2d 23 (App.Div.1966).

**49.** Morgan argues in its brief and at oral argument that the New Jersey study comments should be viewed as supplementing rather than displacing the UCC comments. However, Morgan never produced any authority for this position. Furthermore, Morgan's position that the New Jersey comments are a mere addendum to

the UCC comments is belied by Abram's view that the New Jersey Committee's four studies, one of which later became the study comments, required enormous effort and resulted "in a working tool for the bench, bar and others concerned with commercial law in New Jersey." Abrams, *supra,* at 3, 2 n. 6 (Abrams also notes that New Jersey's study comments were described by the National Conference on Commissioners as "the most thorough comparative study of the Code which any state has produced"). Likewise, in his preface to report # 2, which is reprinted in N.J.Stat.Ann. § 12A, at 1–2 (West 1962), Abrams writes that the "Commission's annotations ... *interpret and explain the operation of the section* pointing out particularly its New Jersey history and its effect on prior New Jersey law." (emphasis added).

islature's presumed awareness thereof we find it reasonable to conclude that had the legislature of this state meant that attorney fees could be awarded under [§ 4–207(3)], it would not have left that authority to be founded only in the [UCC] Commissioner's Comment. The statute does not expressly authorize an award of attorney fees, and in this respect we adhere to our historical position.

*Riedel,* 287 Or. at 291, 598 P.2d 302.[50]

We are aware that courts interpreting the law of other jurisdictions have reached contrary results. *Perkins,* 632 F.2d at 1315–16; *Bagby,* 491 F.2d at 198 n. 9; *Hartford Accident & Indem. Co. v. First Pa. Bank, N.A.,* No. 86–7363, 1988 WL 11663 (E.D.Pa.1988) (1988 U.S.Dist. Lexis 1502, 1508); *First Nat'l Bank of Neenah v. Security Nat'l Bank of Springfield,* 32 U.C.C.Rep.Serv. (Callaghan) 926, 936–37 (D.Mass.1981); *First Va. Bank–Colonial v. Provident State Bank,* 582 F.Supp. 850 (D.Md.1984); *Guaranty Bank & Trust Co. v. Federal Reserve Bank,* 454 F.Supp. 488, 492 (W.D.Okla.1977); *Southern Provisions, Inc., v. Harris Trust and Sav. Bank,* 96 Ill.App.3d 745, 52 Ill.Dec. 352, 422 N.E.2d 33 (1981); *Seattle–First Nat'l Bank v. Pacific Nat'l Bank of Wash.,* 22 Wash.App. 46, 587 P.2d 617 (1978). But after a careful reading of these cases, we do not find them persuasive given the history and present tenor of New Jersey law.

For the foregoing reasons, we predict that the New Jersey Supreme Court would not allow Morgan to recover attorneys' fees under § 4–207(3). It is not the place of a federal court to chart new, unexplored areas when trying to interpret a state's law. *Cf. Becker v. Interstate Properties,* 569 F.2d 1203, 1206 (3d Cir.1977), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978) (in a "diversity case[ ] a federal court must be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudications by the state courts"). We find that New Jersey law requires a

stronger showing of legislative intent than has been made here in order to overcome the presumption that attorneys' fees are not a recoverable item of damages. We realize this may seem like a harsh result to Morgan since it was drawn into a litigation not of its own making, where liability appeared clear, and in which it seems Morgan made every attempt to minimize their litigation expenses and proffer the defense to Midlantic. However, we believe that such appeals are best made to New Jersey's legislature not this Court. We will, therefore, vacate the judgment against Midlantic as it relates to the award of attorneys' fees, and remand the case back to the district court for the entry of a judgment consistent with this Opinion.

## VII.

## CONCLUSION

To summarize, we agree with the district court's decisions to bar the use of both the *in pari delicto* and the "faithless employee" defense. In addition, we find no reversible error in the district court's molding of the jury's verdict as to compensatory damages or in its award of punitive damages against both appellants. Thus, we will affirm the judgments in favor of McAdam and against Dean Witter and Midlantic. However, we do not believe that attorneys' fees are appropriate under New Jersey law in an action under § 4–207, so we will vacate the judgment in favor of Morgan and against Midlantic in regards to that item of recovery. Each party to bear its own costs.

WEIS, Senior Circuit Judge,
concurring in part and dissenting in part.

Aided by the acknowledged acuity of hindsight, it is obvious that the confusion over the damage awards likely would have been avoided by bifurcation of the liability and damage phases of this case. *See Franklin Music Co. v. American Broad-*

---

**50.** We note that we must take an even more cautious position than the Oregon Supreme Court given that we are predicting New Jersey law and that the statute we interpret has a state study comment that conspicuously fails to follow the UCC comment.

casting Cos., 616 F.2d 528, 538 (3d Cir. 1979). Counsel who urged a potpourri of theories for recovery should have recognized that difficulties in reconciling the jury's findings would inevitably occur.

A strong argument can be made here that the answers to the interrogatories on compensatory damages are so confusing that the only solution is to order a new trial on those issues. See Bereda v. Pickering Creek Indus. Park, Inc., 865 F.2d 49, 55 (3d Cir.1989). The district judge and the majority here have persuaded me, however, that it is possible to read the results in such a way as to carry out the jury's apparent intent without wandering too far afield into speculation. But because I remain unconvinced as to the correctness of one item of the award—the damages relating to the UCC counts—I dissent from that portion of the judgment only.

When all of the dust settles, it is clear enough that the jury found that plaintiff had suffered losses in two distinct categories. The first involves the "special investment" scheme, which Murray represented to McAdam as a high-profit venture reserved for Dean Witter's preferred customers. McAdam's contribution to this venture consisted of cash given to Murray and checks made payable to Murray properly drawn by McAdam. In addition to seeking reimbursement for these amounts, McAdam sought to recover for losses of profits, allegedly suffered by companies he controlled. The jury apparently rejected the latter item, but did find against Dean Witter in the amount of $448,247.00 for the other claims in the common law counts. There was evidentiary support for this damage award, and I agree to that extent that the judgment should be affirmed.

The second category, that representing the UCC counts, is confined to the plaintiff's loss from Murray's forgery of endorsements on checks made payable to McAdam on his money market account. Significantly, the claims in this category are distinct from those relating to the "special investment" scheme. As the district court commented, the charge and the interrogatories to the jury "quite clearly separated consideration" of the two types of losses.

Before McAdam began to participate in the "special investment" scheme, he had a separate money market account with Dean Witter. It was on checks drawn on this fund that Murray forged McAdam's endorsement. The jury found that the total amount of the twelve fraudulently endorsed checks was $466,992.71. The jury also determined that Midlantic Bank's payment of those checks violated the UCC, and assessed resulting damages at exactly the face value of the checks—$466,992.71.

Dean Witter's liability on these counts was established by the following interrogatories and jury answers:

QUESTION 23: Did defendant Dean Witter Reynolds fail to pay to plaintiff any check(s) made payable to plaintiffs on an unauthorized endorsement?
ANSWER: Yes.
QUESTION 24: If answered "yes" what was the total amount of the check(s) involved?
ANSWER: $466,992.71.
QUESTION 25: If # 23 was answered "yes" what if any damages proximately resulted therefrom?
ANSWER: $145,140.00

The discrepancy between the answers to Questions # 24 and # 25 may reasonably be explained by the fact that McAdam had received substantial refunds from Murray. McAdam admitted that he had been paid $162,000.00, and there was evidence from which the jury could have found that he received an additional sum of approximately $155,000.00. These refunds would reconcile the jury's findings that although the total amount of the checks was $466,992.71, McAdam's net loss in the UCC counts was $145,140.00.

It follows inexorably that if McAdam's net loss on the forged checks was $145,140.00, then an award in excess of that amount against Midlantic Bank is duplicative and not sustainable. Plaintiff attempts to explain this result with two alternative theories. The first is that the payments that McAdam conceded he received from Murray—at least in part—were de-

ducted by the jury in its computation of the damage award for the first or "special investment" claims. There is, however, no support in either the jury charge or the interrogatories for that theory, and it is discredited by the fact that in the UCC counts the jury found Dean Witter liable for an amount different from the face value of the checks. One cannot escape the fact that the jury made a deduction to reach the $145,140.00 award on the UCC counts. There is nothing to support the speculation that the jury made any deduction to reach the figures on the common law counts.

The plaintiff's second hypothesis is that the offset and the resulting difference in the awards assessed against Dean Witter and Midlantic somehow reflect a jury finding of varying levels of responsibility between the two defendants. This theory is based on Dean Witter's failure to utilize its Account Executive Check Receipt Forms when checks were drawn on McAdam's money market account. Properly used, the Forms required the signatures of the account executive, the branch office manager, and the customer himself.

The district court adopted this theory, stating, "[T]he jury could have found that DWR's failure to utilize its Account Executive Check Receipt Forms ... did not proximately cause all of plaintiffs' damages visa-vis the forged checks, whereas Midlantic's failure to follow proper check cashing procedures was a cause of all of plaintiffs' losses in this regard." The court did not explain its reasoning, but apparently used some type of comparative fault analysis, which was not, however, included in the charge to the jury.

The plaintiff's relative responsibility theory makes for interesting speculation, but again there is nothing in the record that would give it credence. Plaintiff contends that the inconsistent awards against Dean Witter and Midlantic Bank show that the jury determined that Dean Witter's failure to utilize the Forms resulted in only a portion of McAdam's losses on the forged checks. The district court's instructions and the interrogatories, however, did not allow the jury to make such a finding.

The court did not charge on relative responsibility for the forged checks as between Dean Witter and the bank. In any event, I find it difficult in the circumstances here to accept any interpretation of jury findings that would grant Dean Witter immunity for part of its misappropriation of the funds entrusted to it.

Putting aside the question of whether an instruction on relative responsibility would have been erroneous, the charge by definition requires allocation of fault between the alleged wrongdoers. Under the plaintiff's theory, Dean Witter and Midlantic would have to share in the liability for McAdam's losses on the forged checks. The district court did not reach that result, but entered judgment on the UCC counts against the bank alone.

It is understandable that the jury might not have understood that McAdam's recovery on the UCC counts—even from the bank—was limited to his loss after crediting what Dean Witter had replaced. The district court's charge did not take that eventuality into account. The omission was the result of the inability of counsel and the court to anticipate all of the numerous permutations that could result from submission to the jury of multiple, and in some cases, inconsistent theories of liability and damages.

Insofar as the UCC counts are concerned, I would affirm a judgment in favor of plaintiff in the amount of $145,140.00, plus pre-judgment interest, jointly and severally, against Midlantic Bank and Dean Witter. I agree with the majority's disposition of the remaining issues.